# THE SUPREME COURT

OF

# OREGON.

## MARCH TERM, 1889.

[ Filed April 24, 1889. ]

## ALEXANDER WOOD, Appellant, *v.* S. RAYBURN, Respondent.

DEFECTIVE DEED—POWER TO CONVEY—SPECIFIC PERFORMANCE.—Where a party to a deed labors under no disability, and by reason of some defect or technical informality his deed fails to pass title according to the intent of the parties, in a proper case, a court of equity will treat such defective or irregular deed as an agreement to convey and enforce it specifically on the same terms and conditions that other agreements in writing to convey real property are enforced. This is the general rule.

COMPLAINT—ALTERNATIVE RELIEF.—Where a complaint is framed with a view to alternative relief, and upon the trial in this court the plaintiff presents only one aspect of his case, the other will be treated as waived and will not be passed upon or considered.

NOTICE—BONA FIDE PURCHASER—WHAT WILL PUT A PARTY ON INQUIRY.—Where a party has notice of such facts as ought to put an ordinarily prudent man on inquiry, a failure to make inquiry is visited with all of the consequences of actual notice.

NOTICE—AGENT.—It is a general rule that notice to an agent is notice to the principal. The test is whether the information was of a character which it was the duty of the agent to communicate. If so, it binds the principal.

BONA FIDE PURCHASER FOR VALUE—PLEADING—PROOF.—To give a defendant the *status* of a *bona fide* purchaser of land for value and without notice, it must be alleged and proven, amongst other things, that the person who conveyed to the defendant was seized in fee or pretended to be so seized *and was in possession* if the conveyance purported an immediate transfer of the possession when he executed the deed to such purchaser.

SAME—PAYMENT OF PURCHASE MONEY—NOTICE OF CLAIM.—To constitute one a *bona fide* purchaser, he must actually have paid the purchase money before he received notice of the claim.

RECITAL IN THE DEED—CONSIDERATION.—It must be proved independently of the recital in the deed that the consideration was paid before receiving notice, and it is not enough to show that it was secured to be paid by mortgage or otherwise.

APPEAL from Benton county.

*John Burnett, John Kelsay,* and *W. S. McFadden,* for Appellant.

*J. W. Rayburn,* for Respondent.

STRAHAN, J.—This is a suit in equity. Its object is either to have a certain deed dated in July, 1881, made by one Mary E. Huffman to the plaintiff, enforced as an agreement to convey certain real property situated in Benton county, or to charge the purchase price of said land with interest upon it, and to have a decree for the sale of said real property to pay the amount.

The purchase price is $592.50, with interest since July, 1881. It appears that prior to the ninth day of July, 1881, Mary E. Huffman was the wife of one W. H. Huffman, and that she was the owner in fee of the real property in controversy; that on the twenty-seventh day of March, 1879, Huffman and his wife executed to the plaintiff Wood a mortgage on the property in controversy to secure the payment of $427 and interest; that said mortgage was duly recorded in Benton county; that on the eighteenth of November, 1880, there was a decree foreclosing said mortgage entered in the circuit court of Benton county, Oregon, for the sum of $511, with costs and disbursements; that about the month of July, 1881, the plaintiff and W. H. and Mary E. Huffman entered into an agreement whereby it was agreed that, in consideration of the amount then due on said mortgage, and as payment, and in satisfaction of said debt, they sold said premises to said Wood and agreed to convey the same to him by deed; that on the ninth day of July, 1881, Mary E. Huffman, being still the wife of W. H., undertook to convey said premises to the plaintiff in pursuance of said agreement, and for that purpose signed and delivered to him the following writing:—

"Know all men by these presents:

"That I, Mary E. Huffman, of Nez Perce county, Idaho Territory, party of the first part, for and in consideration of $1,250, to me paid by Alexander Wood, of Benton county, and State of Oregon, do hereby grant, bargain, sell and convey to said Alexander Wood, to his heirs and assigns forever, the following described parcel of real estate, to-wit: [Here follows the description of the lands as set out in the complaint.] Together with the tenements, hereditaments and appurtenances thereunto belonging or in any wise appertaining, and also all her estate right, title and interest at law and equity therein or thereto, including dower and right of dower, to have and to hold the same to the said Alexander Wood, his heirs and his assigns forever.

"And I, Mary E. Huffman, do covenant with the said Alexander Wood and his legal representatives forever that the said real estate is free from all incumbrances, and that she will, and her heirs, executors, administrators shall warrant and defend the same to the said Alexander Wood, and to his heirs and assigns forever, against the lawful claims and demands of all persons whatsoever.

"In witness whereof, I have hereunto set my hand and seal this ninth day of July, A. D. 1881.

"MARY E. HUFFMAN.   [SEAL.]

"Signed, sealed and delivered in presence of :

"R. H. BARTON.

"TERRITORY OF IDAHO, } ss.
    County of Nez Perce. }

"This certifies that on this ninth day of July, 1881, before me, the undersigned, a justice of the peace in and for the said county and said Territory, appeared the within-named Mary E. Huffman, who is known to me to be the identical person described in and who executed the within instrument, and acknowledged to me that she executed the same freely and voluntarily for the uses and purposes therein mentioned.

"In witness whereof, I have hereunto set my hand and seal, the day and year last above mentioned.

"R. H. BARTON, justice of the peace.

"TERRITORY OF IDAHO, ⎱ ss.
    County of Nez Perce. ⎰

"I, ———, clerk of the court in and for said county and State, the same being a court of record, having a clerk and seal, do hereby certify that R. H. Barton, whose name is subscribed to the certificate of acknowledgment to this deed, was at the date thereof, to-wit, July 9, 1881, a duly-commissioned, qualified and acting justice of the peace in and for said county of Nez Perce; that he is authorized by the laws of Idaho Territory to take the acknowledgment of deeds; that I believe his signature subscribed thereto to be genuine signature, and that said deed is executed and acknowledged according to the laws of Idaho Territory.

"In witness whereof, I have hereunto set my hand and the seal of said court this twenty-first day of December, 1881.

[SEAL.]          "JOHN H. EVANS, county clerk.

"This deed received for record and recorded December 24, 1881, and the certificate of the court was received and recorded December 24, 1881.

"B. W. WILSON, county clerk."

The defendant's answer contains specific denials of each and every allegation of the complaint, and then follows with a separate defense, to-wit: "Defendant for another and a separate defense to the matters alleged in plaintiff's complaint herein, alleges the following facts, to-wit: "That on the —— day of October, 1886, one Mary E. Huffman was the owner in fee simple of the real property mentioned in the complaint in this suit; that on said last-mentioned day the said Mary E. Huffman, for a valuable consideration, sold, by a good and sufficient deed, with the usual covenants of warranty, executed under her hand and seal, to the said Ed. L. Rayburn every portion of said real property; that at the time of the execution of the deed by the said Mary E. Huffman to the said Ed. L. Ray-

burn, as above stated, the said Ed. L. Rayburn had no
notice of the matters alleged in plaintiff's complaint; that
on or about the —— day of November, 1886, the said Ed. L.
Rayburn made and the said S. Rayburn made and entered
into an agreement wherein and whereby the said Ed. L.
Rayburn for the price and sum of $1.000 promised and
agreed to sell and convey to the said S. Rayburn the real
property mentioned and described in the complaint; that
on said last-mentioned day the said S. Rayburn paid to the
said Ed. L. Rayburn the sum of $1,000; and the said Ed. L.
Rayburn, on the said day, under his hand and seal, made,
executed and delivered to the said S. Rayburn a good
and sufficient deed, with the usual covenants of warranty,
wherein and whereby he conveyed to the said S. Rayburn
the whole of the real property mentioned and described in
complaint; that in said deed the said Ed. L. Rayburn
covenanted to and with this defendant that he was the
owner in fee-simple of said real property and every part
thereof, and that he would warrant and defend the same
from the claims of all persons whatsoever; that at the
time this defendant paid to said Ed. L. Rayburn the said
$1,000 and took said deed, he did not have any notice what-
ever of any of the pretended rights or equities of plaintiff
or of the matters and things alleged in plaintiff's com-
plaint; that soon after paying the said sum of $1,000 to
and receiving from the said Ed. L. Rayburn said deed or
conveyance, this defendant went into and ever since said
time has been and now is in the actual, open, notorious and
adverse possession of said real property and every part
thereof, and has since said time made valuable and perma-
nent improvements thereon of the value of $100; that at
and during all* the times stated in said complaint the said
Mary E. Huffman was a married woman, she being at all
of said times the wife of one W. H. Huffman, who was then
and is now alive; that on the —— day of July, 1881, and
at the time of the making the pretended agreement men-
tioned in complaint, the said Mary E. Huffman resided at
or near Moscow in Idaho Territory; that the laws of Idaho

Territory relating to the execution of deeds by married women in force at said time was and is as follows: [Here defendant sets out what he claims to be the laws of the said Territory as relates to married women]; that this defendant is the owner in fee-simple of every part of said real property."

The reply denied the new matter in the answer. The cause was referred and the evidence taken in writing. The court below found for the defendant and dismissed the suit, from which decree the plaintiff has appealed.

It further appears from the evidence that the plaintiff entered into the possession of said premises in the latter part of July, 1881, and then placed Doc. Ross in possession, who was to keep up the fencing and improvements for the use of the place. Next Mr. Stewart rented the place and kept it up for about two years. The rent was $50 a year, one-half payable in improvements on the place; next came Mr. Felger, who had the place for about two years on the same terms as Mr. Stewart. Ross and Stewart occupied the house on the premises during their terms, and Felger during a portion of the first year, perhaps to the month of April.

1. As against Mary E. Huffman or any person claiming under her who is not a *bona fide* purchaser for value and without notice, equity has the power to charge the amount of the purchase price of this land upon it. When a party to a deed labors under no disability, and by reason of some defect or technical informality his deed fails to pass title according to the intention of the parties, in a proper case, a court of equity will treat such irregular or defective deed as an agreement to convey, and enforce it specifically on the same terms and conditions that other agreements in writing to convey real property are enforced. This is the general rule. In *Frarey* v. *Wheeler*, 4 Or. 190, it was held, in substance, that a married woman's deed would not be treated as an agreement to convey nor would she be required by the decree of the court to convey the real property described in such deed. This doctrine depended entirely

upon the disability of coverture.   Mrs. Huffman at the time she made the deed to the plaintiff was a married woman. The deed was executed in the Territory of Idaho, but not in accordance with the laws of that Territory.   The complaint is framed with a view to either enforce the deed as an agreement to convey or to obtain a decree charging the purchase money upon the lands.   The plaintiff's right to a specific performance in such case as against the defendant Rayburn was not discussed or insisted upon at the trial. For that reason we do not consider or pass upon that aspect of the case.   It may be proper to remark, however, that the statute of 1878 and possibly of 1880 have wrought very radical changes in the law relating to the capacity of married women to contract and their power to dispose of their real property.   But as the appellant did not present this part of his case we treat it as waived.

2.   The next question presented is, whether or not the plaintiff is entitled to the alternative relief which he prays, namely, to make the purchase price of said land which was paid to Mrs. Huffman and her husband a charge upon it. In disposing of this part of the case, it will be most convenient to consider, first, whether the plaintiff would be entitled to that relief as against Mary E. Huffman, and then to determine whether or not the defendant Rayburn stands in such a relation to the transaction as would require the application of a different rule to him.   The facts of this case bring it within the second point decided in *Frarey* v. *Wheeler, supra.*   The principle there announced is not new to equity jurisprudence, and its application to this class of cases sometimes becomes necessary to prevent a failure of justice.   In passing upon that case, Bonham, J., said: "The exempting a married woman from liability on her covenants to convey her real estate, was adopted for her better security and protection, and we do not think it would be equitable or in harmony with public policy or good morals for courts of equity, in protecting the rights of persons, to encourage the perpetration of an actual fraud by them."   The purchase money in that case was accordingly

charged upon the land.   In this case, as has been shown,
the land was under mortgage at the time of the attempted
conveyance.   Mrs. Huffman and her husband agreed with
the plaintiff, that in consideration of the satisfaction of the
amount of said decree, they would convey him the land.
Mrs. Huffman, in whom the title was vested, undertook
and attempted to perform this agreement, but by reason
of informality in the execution of the deed, she failed
to do so.   What further was done under this agreement
has been already shown.   Under these facts, to turn a
party out of court without relief would be contrary to the
first principles of equity and a reproach to the jurispru-
dence of the State.   It would be a case where technical
quibbles without merit had gained a complete mastery over
the plainest principles of justice.   I think therefore that we
ought to hold that the plaintiff is entitled to the alternative
relief prayed for unless there is something in the facts and
circumstances of Mr. Rayburn's claim which gives him a
right superior to that of the plaintiff, and to that our atten-
tion will now be directed.

3.   It is conceded that some time prior to the month of
October, 1886, Mary E. Huffman had procured a divorce
from her husband, and some time during that month she
conveyed the premises in controversy to Edward L. Ray-
burn.   It is alleged in the answer that said deed was for a
valuable consideration, and that it contained the usual
covenants of warranty, and that he had no notice of the
matters alleged in the plaintiff's complaint, and that S.
Rayburn thereafter purchased said premises from Ed. L.
Rayburn and received a deed with the usual covenants of
warranty.   It is also claimed that when the defendant took
the deed from Ed. L. Rayburn he did not have any notice
whatever of any of the pretended rights or equities of the
plaintiff, or of the matters and things alleged in plaintiff's
complaint.   It is claimed that this deed to the defendant
was followed by possession soon afterward, which has been
maintained ever since.   An equity that was good against
Huffman and wife must prevail against those who succeed

to the estate affected by such equity, unless the same is barred or cut off by reason of such successor being a *bona fide* purchaser for value of such estate without notice of such equity. If Ed. L. Rayburn occupied that position the equity is gone; if S. Rayburn is such *bona fide* purchaser, the same result follows. An examination of the facts and circumstances touching all of these alleged purchases is therefore necessary.

Before proceeding to this examination, it is proper to premise that S. Rayburn is the father of Ed. L. Rayburn and J. W. Rayburn, who took a prominent part in conducting these negotiations. There is one fact which has not been as yet referred to, which it now becomes necessary to mention. It appears from the evidence, and is not disputed, that the plaintiff was the owner of a mortgage for $200 on the premises in controversy, made by one Banks, which was prior to the mortgage Huffman and wife had executed to him, and that he negotiated a loan of $200 of Jacob Modie and aimed to assign this Banks mortgage to Modie for security; but in some manner, which is not fully explained, he assigned to Modie his own decree against the Huffmans, foreclosing his junior mortgage. This was clearly a mistake. Neither party seems to have understood just what was assigned. Modie seems to have been wholly unconscious that the decree foreclosing Wood's mortgage had been assigned to him.

Mr. J. W. Rayburn narrates his connection with this transaction as follows: "Mr. F. B. Dunn obtained a judgment in 1877 against W. H. Huffman, husband of Mary E. Huffman. In 1884 an execution was issued on this judgment and the premises mentioned in this deposition by me were levied upon and advertised for sale to satisfy that execution, whereupon Mr. Wood, the plaintiff herein, commenced a suit in the circuit court of this county to enjoin said sale. The suit was against F. B. Dunn and Sol. King. I was the attorney for Mr. Dunn in these matters during all this time. I think it was in August, 1886, and while this suit was pending, that I discovered that Mr. Jacob

Modie appeared to be the owner of a decree that had, been rendered in the circuit court of Benton county in a suit wherein Alexander Wood was plaintiff and W. H. and Mary E. Huffman were defendants. From some source I learned that this decree had been paid, but I cannot now say from whom I learned it. The decree had not been canceled of record. I wrote to Mr. Modie, who then resided in Lane county, Oregon, enclosing a self-addressed postal card, asking him when he would be at Corvallis, and requesting him to call at my office when he came. A few days afterward I received the postal card I sent him, on which he stated that he would be here on a certain day, naming the day. He did not come on the day named, but came on the eleventh day of October, 1886. I then asked him about this decree, and, as I understood him, he told me that it was paid. I told him that the records did not so show, and asked him if he would go to the court house and satisfy this decree, which he agreed to do; and together we went to the court house, and he entered full satisfaction of this decree, as I now remember. Wood's name was not mentioned by either of us at that time. I thought at that time that Jacob Modie was the absolute owner of that decree, and I did not know to the contrary till long afterwards. This decree was satisfied before Ed. L. Rayburn bought these lands and before S. Rayburn had any interest in them, and as far as I know neither Ed. L. Rayburn nor S. Rayburn contemplated buying these lands at that time. Whatever I did in the matter I did in the interest of my client, F. B. Dunn."

The witness continues: "On the twenty-third day of October, 1886, Ed. L. Rayburn became the owner of these premises; he, on said day, having received Mrs. Huffman's deed for the same."

Mr. Jacob Modie, a witness for the plaintiff, gave the following account of the same transaction: "In August, 1886, I received a letter from J. W. Rayburn asking me when I would be in Corvallis, requesting that when I came to Corvallis, I would call at his office. I answered that I

would be down soon and would call. I did not come as soon as I anticipated. In September I received another letter of the same import, each containing a self-addressed envelope. In October I came to Corvallis,—met Mr. Rayburn. He asked me to go to the clerk's office with him. He told me he wanted my signature to a satisfaction of claim I held against Mr. Wood as security for money loaned Mr. Wood. I told him if it was right and proper I would place my signature to said satisfaction, and did so on being assured by him that it was right and proper."

The witness also added in substance that when he signed his name to the satisfaction of date of October 11, 1886, he intended to release Mr. Wood from any obligation to him, he having paid witness in full, and that he had no interest in the decree and did not know that he owned said decree. Mr. Modie further testified that the security he was to get from Mr. Wood for the money was a mortgage made to L. I. Banks, and that by mistake the decree in favor of Wood and against Huffmans was assigned to him. He further says that by mistake he satisfied the decree,—that he should have assigned it back to Mr. Wood,—and that it was by the request of J. W. Rayburn that he signed it satisfied.

Twelve days after this mistake was entered on the records in the clerk's office at Corvallis, Mr. J. W. Rayburn called on Mrs. Mary E. Huffman at her father's residence near Philomath, and she relates what occurred during that visit substantially as follows:—

"Mr. J. W. Rayburn came to father's about the last of November, 1886, Philomath, Oregon, and asked me to sign a paper that he had. I asked him what it was. He said it was in the form of a deed—a scheme of his; did not know that it would amount to anything. I told him I did not like to sign it, for I was afraid it would get me into trouble. He said, no, it would not. He said he would take all the responsibility off of my shoulders in this Wood case and he would fight the battle for me. My mother came into the room—Mrs. Ross—and said: 'Mr. Rayburn. I'm

afraid you will get my daughter into trouble.' He says, no, Mrs. Ross, I will stand between her and all trouble. The paper he called a deed was a blank except the printed part at the top. Mr. Ed. Rayburn's name was not mentioned to me. He wanted me to go before Mr. Brownson to have it filled out, but I could not leave, as we had a sick man to take care of. I signed the blank; did not know that I had made a deed to Ed. Rayburn till I saw it in the *Benton Leader.*"

She further says in substance that she made no acknowledgment to any officer that I had made a deed to Edward L. or Ed. L. Rayburn. "The signing of that blank is the only time I signed a deed except to Mr. Wood, and I didn't know at that time that it was to Ed. L. Rayburn, as his name was not mentioned. I never acknowledged before J. W. Rayburn at any time that I had made out a deed to Ed. L. Rayburn. I received nothing from either of the Rayburns for the lands mentioned in this suit."

"Question 18. State fully what, if anything, you may know about the $200 consideration mentioned in the deed of Mary E. Huffman to one Ed. L. Rayburn in this suit?

"Answer. I never received any money from Ed. L. Rayburn or any other Rayburn; only witness fees from J. W. Rayburn."

There is much more to the same purport, and this witness fully and explicitly denies that she ever received any money from J. W. Rayburn except $20 as witness fees; and she denies that she owed him any sum whatever as attorneys fees or otherwise.

Mrs. Ross, the mother of Mary E. Emmerson, late Huffman, corroborates what her daughter says occurred at the interview at the time the deed was signed.

Mr. J. W. Rayburn testified in substance that the consideration of the deed to Ed. L. Rayburn was $200. Mr. Rayburn's account of this transaction and of the consideration is more particularly stated in his evidence as follows: * * * "During the pendency of the suit between A. Wood, Sol. King and F. B. Dunn, I became of the opinion that

a certain paper purporting to be  *  *  *  and told Mrs. Huffman as much.   I told her in what particular this deed was void.   My recollection is that I explained everything to her fully.   She at that time owed me whatever my services were worth for advice concerning these divorce suits in Washington Territory; and I asked Mrs. Huffman then and there upon what terms she would deed this place to me. Whether we agreed upon terms then and there, I don't now remember, but afterwards we did, and they were as follows:   She would deed me or any persons I might name the lands, or whatever interest she had in them, for forty dollars in money, my bill against her at that time, and I agreed to defend any suit which Huffman might bring in this State for a divorce and the children, or for the children alone; or, if she wanted a divorce, I promised and agreed to obtain a divorce for her as her attorney, if I could do it.   The whole of this consideration on my part was estimated by us at $200.   This arrangement was in part made at Corvallis, but subsequently carried out at Philomath.   I filled up the deed made by her to Ed. L. Rayburn  *  *  *  on, I think, the twenty-third day of October, 1886.   I then went to Philomath, where she then was; found her at her father's; talked with her about the matter and  *  *  *  asked her to go with me before Mr. Brownson, justice of the peace, to acknowledge the same.   At that time to my knowledge there was no other person residing at Philomath before whom a deed could be executed.   She made some excuse about not being able to go, which, as I now remember, she was not fixed up,—dressed up to her notion to go down the street.   I told her I would go and get Brownson and bring him there.   I went to Brownson's house but found that he was out of town.   I went back to Ross', where Mrs. Huffman was; told her that Mr. Brownson was not at home; told her that I would take the acknowledgment myself, and she then and there signed that deed and executed it as deeds are usually executed in this State.   It was acknowledged regularly.   Mr. George Mason, I think his name was, along with myself, witnessed

it. The deed she signed there that day was an ordinary blank deed,—an ordinary printed deed,—and had every word written in it above the name that now appears there. When she says that this was a blank deed she states that which is positively and absolutely false. In addition to what I paid her then and before, and what I agreed to do by way of defending suits, for which we estimated at $200, I told her that I would have, if I succeeded in holding it,— that I would have to pay Mr. Dunn's claim, which then amounted to something over $350."

This witness further says in substance that at the time the deed was executed he paid Mrs. Huffman the remainder of the $40 that he was to give her, which amount he thought was $20, but would not be sure.

In relation to the consideration, he says further in his deposition: "She got $40 in money, the services that I rendered her, and the promise on my part to defend any suit against her for a divorce or her children; or in event she desired a divorce, I agreed to bring the suit for her."

This witness, in explanation of how it happened that he had the deed to this land made to his brother Ed. L. Rayburn, says: "He is my brother and was expecting to get married at that time and thought he would like to live on the place, and he and I arranged that I would try and get him the place. He afterwards changed his mind about going on the place and accepted employment in the O. R. & N. Co.'s office in Portland, where he has been ever since and is now."

Mr. S. Rayburn, the defendant, was called as a witness in his own behalf and says substantially: "I am the owner in fee-simple of the property in controversy. I purchased it of Ed. L. Rayburn in the fall of 1886, I believe it was. I paid him $1,000 in a note and mortgage as security. I have since paid of this note $300. At the time I obtained the, deed from Ed. L. Rayburn, Ben. Felger had some stock on the place. He was not then living in the dwelling-house, and there was no one residing on the place at the time I obtained the deed. I did not know before the commence-

ment of this suit that Wood claimed an interest in these lands. I took possession about the fifteenth or sixteenth of February, 1888, of the home and garden land. I served a notice on Felger to leave the premises. I served notice on him to get rid of his stock. The stock was on the pasture. Felger paid rent to me the last year he pastured his stock there. I purchased these premises in good faith and with the intention to make it my future home. I can't give any date when I first learned that the plaintiff claimed to have some interest in these lands, but I think it was last March."

Mr. J. W. Rayburn being re-called as a witness for the defendant, testified, in substance, among other things: "S. Rayburn paid Ed. L. Rayburn $1,000 for these premises. He gave his note payable in two years' installments, secured by a mortgage on these same premises; the note is an ordinary negotiable note, and I to-day own that note. S. Rayburn has paid $300 on that note, which payment was made about the first day of February, 1888."

In another part of his evidence, Mr. J. W. Rayburn, speaking of this same subject: "When Ed. Rayburn determined to go to Portland I purchased of him the note and mortgage. After I bought a piece of property from J. R. Bayley, where I now live, I determined to repair the house thereon, and I determined also to build a new one on the north portion of this property, near the O. & C. R. R. track. S. Rayburn is a practical carpenter and joiner, and he did nearly all the carpenter work in repairing my house and building this new one. The whole of this work was done by him in the year 1887. When we settled, about the middle of January, or at the farthest the first of February, 1888, I owed him a balance of $300, which, as agreed then and there by us, to be applied on this note and mortgage. The house that he built is still on the premises and is occupied by a renter of mine for a yearly rental of one hundred dollars. The defendant has never been paid for the work he did for me in any other way than as above stated."

These I believe to be all the main or essential facts tes-

tified to by any of the witnesses. Conceding as proven every fact which this evidence tends to prove, the question remains, is this property put beyond the reach of the plaintiff's equity, or is it protected from the plaintiff's equity by reason of any or all of those facts? In other words, was either Ed. L. Rayburn or S. Rayburn a *bona fide* purchaser of this property for value and without notice, within the equity rule on that subject? I can see no escape from the conclusion that this question must be answered in the negative.

It was scarcely claimed upon the argument here that Ed. L. Rayburn was such purchaser, nor could the claim be sustained if made. If Ed. L. Rayburn can be regarded as in any sense a purchaser, he simply acquired and held the legal title through the agency of his brother, J. W. Rayburn. Whatever consideration there was for the deed, passed from J. W. Rayburn to Mrs. Huffman, and not from Ed. L. J. W. had knowledge of the deed from Mrs. Huffman to the plaintiff at the very time he was engaged in these negotiations, and it is manifest that it was because he believed the deed to be void that he engaged in them. Notice of the fact was of such a nature as ought to have put an ordinarily prudent man on inquiry, and in such case a failure to make inquiry is visited with all of the consequences of actual notice. (*Mier* v. *Blume*, 80 Mo. 179.) But it was suggested upon the argument here that notice to J. W. Rayburn would not affect those for whom he was acting in making the purchase. It is a general rule that notice to the agent is notice to the principal. In procuring the deed from Mrs. Huffman to Ed. L. Rayburn, J. W. Rayburn was either Ed. L.'s agent or he was a mere volunteer; in either event, if Ed. L. accepted his work or the proceeds of his contract, he would be affected by whatever was notice to J. W. R. Perhaps no better statement of the principle can be found than is contained in Wharton's Agency and Agents, § 178. He says: "The better opinion is, that whenever the agent, acting in the scope of his duties for his principal, receives notice in a matter in

which he represents the principal, such notice is notice to the principal, although the notice is not received in the identical transaction to which the notice relates. The test is, whether the information was of a character which it was the duty of the agent to communicate. If so, it binds the principal." And it was held in *Whitney* v. *Burr*, 115 Ills. 289, that if an agent has notice at the time of his purchase for his principal of the equitable rights of another, and of the claim of the latter to have previously purchased the subject matter of the sale, this will be notice to the principal. (Am. & Eng. Ency. of L., v. 7, p. 419, and cases cited.) But there is another objection to the defendant's claim that he is a *bona fide* purchaser for value and, without notice, which applies equally to Ed. L. as well as to S. Rayburn, and that is, it is neither alleged nor proven that Mary E. Huffman, at the time of her deed to Ed. L., was in the possession of the premises, and the same omission occurs in respect to the conveyance from Ed. L. to S. Rayburn. These are omissions, not of form but of substance. Storey's Eq. Pl., § 805, states the principle. He says: "Such a plea must aver that the person who conveyed a mortgage to the defendant, was seized in fee, or pretended to be so seized, and was in possession, if the conveyance purported an immediate transfer of the possession at the time when he executed the purchase or mortgage deed." And the learned author of the notes to two leading cases in Equity, part 1, p. 63, states the rule in the same language, and I have been unable to find any authorities that hold otherwise.

No witness testifies that Mary E. Huffman was in possession of these premises at the time she made the deed to Ed. L. Rayburn, nor is it pretended that S. Rayburn obtained possession until sometime in the month of March, 1888, and it does not appear anywhere in this record that Ed. L. was in possession of said premises at any time.

At some time prior to the month of March, 1888, Ben. Felger, the plaintiff's tenant, had leased the premises of the plaintiff, and he says that he had possession of the field

and a part of the pasture, and about that time the defend-
ant entered the house by force or by breaking into it.

There is another objection to the defendant's claim which
seems almost as serious, and that is the payment of the pur-
chase money.    There is a conflict in the evidence as to the
amount of purchase money paid by J. W. Rayburn, and
how it was paid, and we do not find it necessary to pass on
that question; but there is no conflict as to the alleged con-
sideration from S. to Ed. L. Rayburn.    He gave his note to
Ed. L. in 1886 for $1,000, secured by a mortgage on the
same premises; at some time thereafter the same was
transferred to J. W. R., who was the owner of it at the
time he testified.    In 1887 S. Rayburn did some work for
him, and in January or February, 1888, upon a settlement
between father and son, there was found to be due S. Ray-
burn $300, which was credited on the note.    The author-
ities are that to constitute one a *bona fide* purchaser he
must have actually paid the purchase money before he
received notice of the claim.    (*Jackson* v. *McChesney*, 7 Cow.
360; *Jewitt* v. *Palmer*, 7 Johns. Ch. 65.)    And it is laid
down in *Union Canal Co.* v. *Young*, 30 Am. Dec. 212, that it
must be proved independently of the recital in the deed
that the consideration was paid before receiving notice,
and is not enough to show that it was secured to be paid
by mortgage or otherwise.    (*Dugan* v. *Vattin*, 25 Am. Dec.
105; *Blight* v. *Banks*, 17 Id. 136; *Donaldson* v. *Bank of Cape
Fear*, 18 Id. 577, and *Nantz* v. *McPherson*, 18 Id. 216, held
the same doctrine.)

So also in two leading cases in Eq., part 1, pp. 75, 76,
holds that to entitle one to protection as a *bona fide* pur-
chaser he must have paid the full price before notice.    But
these authorities must not be confounded with another class
defining the rights of a *bona fide* holder of a negotiable
promissory note secured by mortgage upon land affected
by an equity where such note was negotiated before due
and for value without notice.    The facts of this case do not
require us to consider or decide that question.

There are other questions affecting the defense in this

case, but I cannot think it is necessary to enter upon their decision.   One of them is the nature and character of the plaintiff's possession through his tenant Ben. Felger and Felger's attempt to attorn to the defendant as his landlord. If Felger entered under Wood he was Wood's tenant, and his attornment to another would be without effect.   (1 Taylor's L. & T., § 180.)

The zeal and earnestness with which this defense has been pressed upon the attention of the court have induced us to examine this case with more than ordinary care and attention; but with all the research and examination we have been able to bestow upon it, we find ourselves unable to accede to the positions of the defendant's counsel.

It follows from what has been said that the decree in the court below must be reversed, and a decree entered here for the plaintiff for his purchase money and lawful interest from March, 1888, the time when his possession was disturbed by the defendant, and that the premises in question be sold to satisfy the same with costs.