Argued April 29; affirmed July 8, 1932

HILL *v.* HARRITT ET UX.

(12 P. (2d) 1021)

*W. C. Winslow,* of Salem (James G. Heltzel, of Salem, on the brief), for appellants.

*Walter L. Tooze, Jr.,* of Portland (Vinton & Marsh, of McMinnville, on the brief), for respondent.

ROSSMAN, J.   The parties are in accord upon the principles of substantive law governing this cause. The only serious problem which awaits solution concerns the inferences to be drawn from the evidence, a brief statement of which we shall now undertake to make.

Subsequent to their marriage, and prior to 1926, the two defendants, K. W. and Alves Harritt, had lived upon a 33-acre farm in Polk county. The ownership of this farm, and of another in the same county, came to Harritt by inheritance from his parents.   Subsequent to the death of the parents, Harritt's brothers and sisters executed a deed conveying title to both of these properties to K. W. and Alves Harritt.   It is agreed that husband and wife held title by the entireties.   Although the Harritts lived upon the 33-acre farm at that time, Harritt did not operate it, but was employed in the city of Salem at a salary of $155 per month. The two farms were operated by tenants.   Mr. and Mrs. Harritt were the parents of two children who by 1926 had progressed sufficiently in school that their parents believed it advisable to move to the city the better to educate the children.   Accordingly, in that year the Harritts purchased a home in Salem costing $3,800. They paid $1,000 upon the purchase price and assumed two mortgages aggregating $2,800, secured by the home.   At the same time they borrowed $1,700 upon the security of the 33-acre farm, using $1,000 of that sum to make the first payment upon the Salem property. The 14-acre tract was free from all indebtedness and was valued at $1,000.   As witnesses, they estimated the value of the 33-acre farm at $3,800, subject, of course, to the $1,700 mortgage.

In the fall of 1928 Harritt purchased a second-hand Hudson automobile at the price of $675.   According to

both him and his wife, this purchase resulted in marital discord. Harritt testified, "She didn't like it because I didn't get a small car." Mrs. Harritt testified, "I was just opposed to it because I had more or less the responsibility of the home and I was opposed to him buying a car that took so much to operate. * * * His car wasn't paid for and he wasn't paying it, and he just couldn't out of his wages that he got; he was determined to keep it, so he put a mortgage on his place. I was required to sign that mortgage, and I didn't want to do that, but to keep his car he put that mortgage on his place." * * * The Court: "This trouble between you and your husband never reached the proportion where there was any contemplation of a separation or a divorce or anything like that? A. Very nearly, yes. I was really opposed, we never took any steps for that, but I surely was upset about it." According to the testimony, a short separation occurred about this time. But we notice that when Harritt was asked concerning this separation he fixed the time of it as in 1926. We quote from his testimony, thus:

"Q. She never left you, did she? A. About a week once.

"Q. What? A. About a week once.

"Q. How long ago was that? A. 1926.

"Q. Away back in 1926? A. Yes.

"Q. Outside of that week that is about the only what you might call serious difficulty you ever had, you might have your family tiffs? A. The only one to any extent."

Mrs. Harritt did not mention the year when the separation occurred, but testified that it did not last more than several days and that it was followed by marital harmony.

Mr. and Mrs. Harritt swore that the purchase of the Hudson and the resulting household friction caused the two to feel that a settlement of their property rights would be desirable, and that in April of 1929 the two, after much discussion, agreed that Mr. Harritt should execute deeds to Mrs. Harritt for the 14-acre tract and the Salem home, and that she should convey to him the 33-acre farm. They testified that they believed such a division of their properties would be fair, and that they were somewhat influenced to that specific division by the fact that the home had originally been purchased for the wife. However, the parties executed no deeds at that time. Harrit testified, "We just let the thing drift along". His wife, in explanation of the failure to exchange deeds, testified, "I was engineering everything and I could do a little bit better, and we let things kind of run along that way, because he had turned his money over to me and I was making the payments on our house in town." It seems that beginning with April of 1929 Harritt gave his wife $120 every month out of his $155 per month wages.

December 31, 1929, while the son of the Harritts was driving the Hudson automobile he collided with two other cars. Shortly thereafter Harritt sued one Seth Fawk, the operator of one of the other cars which had participated in the collision, but was defeated in the action. Later, four of the occupants of the third car brought actions against Harritt. The latter testified that his Hudson (the one which had caused the discord) was badly wrecked in the collision, and that on April 1, 1930, he purchased another second-hand Hudson at the price of $325. May 19, 1930, while the aforementioned actions were pending, the two Har-

ritts called upon Mr. James Heltzel, an attorney, who prepared the three deeds under consideration, which they thereupon executed. Harritt explained the reasons which caused them to execute the deeds at that time, as follows:

"Well, after this accident, my wife says it has just got to be done, not to put it off any longer, she didn't want her property tied up in litigation.

"Q. What precipitated the execution of it and the manner in which it was carried out, what made you execute the deeds when you did? A. I got the car smashed up and I got another and she demanded that I get things straightened up right then."

Mrs. Harritt gave the following explanation of why the deeds were executed at that particular time:

"A. The same old story, my husband was going to buy another expensive car to keep up, he couldn't pay for the car he had before so I opposed it again, I was opposed to him buying another expensive car, it wasn't so much the cost of the car as the running expenses, and I objected to it again, it cost so much and I wasn't agreeable to it.

"Q. State whether or not you made a demand at that time that the agreement be carried out that you divide up the property.

"A. Yes, that was my demand."

Early in 1930 the Harritts had instituted negotiations with a Mr. and Mrs. Working, looking forward to a lease for five years of the 33-acre farm to the Workings. After some discussion, the minds of the parties met and on April 14, 1930, the Harritts informed the Workings that they could have the farm for the requested term. The Workings went into possession about a month later. The Harritts somewhat hurriedly decided to occupy this farm themselves, and, after urging the Workings, without results, to vacate, moved

into another structure upon the farm. In the fall of the year the Workings vacated, although they were compelled to abandon their crops. The testimony indicates that the Harritts returned to the farm on account of their alarm about the possible outcome of the aforementioned four actions. May 31, 1930, Linnie Hill, plaintiff in one of the aforementioned actions, recovered a judgment against Harritt for $2,461; June 5, 1930, Wilma Hill, plaintiff in another of the four actions, recovered judgment for $800. On the same day, in the third action, a judgment for $75 was recovered, and in the fourth, a $1 judgment. September 20, 1930, being four months and one day after the execution of the aforementioned three deeds, Harritt filed a petition in bankruptcy in the federal courts, and on September 27 was adjudged a bankrupt. In his petition he averred that the only item of property which he possessed was the aforementioned 33-acre farm which he classified as exempt. It is agreed that writs of execution have been returned upon the above judgments unsatisfied. Evidence from witnesses other than the defendants indicates that the home and the 14-acre tract exceed in value by several hundred dollars the value of the 33-acre farm. Mr. Heltzel, an honorable member of the bar, testified that May 19 the Harritts consulted him concerning the preparation of the deeds, and added, "I first heard of the difficulty in about the spring of 1929", but did not explain from what source he had heard of "the difficulty" nor of what it consisted. Neither of the Harritts testified that they had consulted Mr. Heltzel prior to May 19, 1930.

The plaintiff contends that Harritt received no consideration whatever for the two deeds which deprived him of his interest in the Salem property and

the 14-acre farm. He also contends that these conveyances were resorted to as means of cheating Harritt's creditors. The defendants admitted that no money whatever was exchanged when these deeds were executed, but contend that the evidence proves that April, 1929, the parties had agreed to exchange deeds and that the execution of the instruments on May 19, 1930, was performance of that agreement.

In order to better understand the relationship of the various events to each other, we summarize the foregoing into the following synopsis: In 1928, Harritt bought the Hudson automobile which caused the marital strife; April, 1929, he and his wife agreed upon the alleged property settlement; December 31, 1929, the son drove the father's car into collision with two others; later, Harritt sued Fawk and was defeated in the trial; later, four victims of the accident sued Harritt; April 14, 1930, the Harritts told the Workings that they could have a lease upon the 33-acre farm and put them into possession; May 19, the questioned deeds were executed; about the same time the defendants hurriedly abandoned their Salem home and returned to the 33-acre farm; at the same time they urged the Workings to vacate the farm and, when the latter left, the crops sown by them were abandoned; May 31, 1930, Linnie Hill recovered judgment against Harritt in an action pending when the deeds were executed; a few days afterward three more judgments were recovered in actions pending when the deeds were executed; September 20, four months and one day following the execution of the deeds, Harritt filed a petition in bankruptcy which prayed that the only item of property scheduled as belonging to him be declared exempt. The question for solution is: Were the two

deeds from Harritt to his wife, which deprived him of all his assets not exempt from execution, supported by a valuable consideration?

1–6. The principles of substantive law which govern this controversy are simple and well settled. A quotation or two from the precedents will suffice to bring them to mind. In *Garnier v. Wheeler,* 40 Or. 198 (66 P. 812), this court said:

"Every conveyance of any estate or interest in lands made with the intent of hindering, delaying, or defrauding creditors is voidable as to them: Hill's Ann. Laws, § 3059; Bradtfeldt v. Cooke, 27 Or. 194 (50 Am. St. Rep. 701, 40 Pac. 1). The grantor's intent to defraud his creditors, however, will not defeat the title of a purchaser for a valuable consideration, unless it appears that the latter had previous notice of such intent: [Hill's Ann. Laws, § 3062; Lyons v. Leahy, 15 Or. 8 (13 Pac 643, 3 Am. St. Rep. 133); Philbrick v. O'Conner, 15 Or. 15 (13 Pac. 612, 3 Am. St. Rep. 139)]. * * * The fraudulent intent is a question of fact (Hill's Ann. Laws, § 3062) which may be established by direct proof, or, in a suit in equity, inferred from the facts and circumstances surrounding the transaction: Coolidge v. Heneky, 11 Or. 327 (8 Pac. 281); Lyons v. Leahy, 15 Or. 8 (3 Am. St. Rep. 133, 13 Pac. 643); Philbrick v. O'Conner, 15 Or. 15 (3 Am. St. Rep. 139, 13 Pac. 612). A conveyance of real property to a relative is always closely scrutinized when *bona fides* of the transaction is challenged by the grantor's creditors; the presumption in such cases being that the fraudulent intention of the grantor, by reason of the intimacy of the parties, must have been known to, and participated by, the grantee."

And from *Western Bond & Mortgage Co. v. Lawton,* 129 Or. 694 (277 P. 826), we quote:

"Plaintiff established a prima facie case by proving an existing indebtedness at the time Dennis Lawton, the judgment debtor, undertook to convey his

interest in the land to his wife. Under the authorities of this state it was then incumbent upon her to show that there was a valuable consideration for Lawton's deed and that she acted in good faith and without intent to hinder, delay or defraud her husband's creditors.''

A conveyance by a husband to his wife in performance of a previous valid agreement between himself and his wife, which is itself based upon a sufficient consideration, will be sustained when attacked by a creditor's suit: 27 C. J., Fraudulent Conveyances, p. 539, § 234, and p. 564, § 275.

■ The evidence clearly indicates that Mrs. Harritt was thoroughly conversant with her husband's financial condition when she accepted the two deeds from him which, together with his claim that the 33-acre farm was exempt as a homestead, rendered him execution proof. Defendants agree that the deeds are unsupported by any consideration, unless the proof substantiates the alleged property settlement of April, 1929, and establishes that the deeds were executed in fulfillment of promises made at that time.

No one testified that the Harritts had not effected the alleged plan for a property settlement in April of 1929, and no one testified that the deeds executed on May 19, 1930, were not made pursuant to that alleged plan. Likewise, no one but the Harritts supported either of the propositions just mentioned. We have not overlooked the testimony of Mr. Heltzel, but he had no information except what he had obtained from the Harritts.

The mere fact that the Harritts testified that they had reached an agreement for a property settlement in April of 1929, and that the deeds, dated May 19, 1930, resulted therefrom, did not compel belief: *White*

*v. East Side Mill Co.*, 84 Or. 224 (161 P. 969, 164 P. 736) ; *Graham v. Coos Bay R. & N. Co.*, 71 Or. 393 (139 P. 337) ; *Taffe v. Oregon R. & N. Co.*, 60 Or. 177 (117 P. 989) ; Wigmore on Evidence (2d Ed.), § 2034; and 23 C. J., Evidence, p. 47, § 1791. A judge is no more required to believe a witness than is an intelligent, responsible spectator seated in the courtroom. Before belief has been achieved it is necessary that the witness pass the scrutiny of the judicial eye, and that his story cope successfully with reason.

In the present instance, it is evident that the testimony of the Harritts failed to produce conviction in the mind of the trial judge. We believe it is also evident from the analysis which we shall now set forth that the testimony which they gave is self-contradictory in part, and in some particulars is opposed to human experience: (1) Mrs. Harritt, who as a witness, seemed more anxious than Mr. Harritt to support the two deeds, according to the notations in the transcript of evidence, hesitated at times upon cross-examination, whereas her direct examination is free from such notations; (2) to several questions directed to Mrs. Harritt upon cross-examination, inquiring whether her husband's intention to file a petition in bankruptcy was discussed at home, she made evasive replies or claimed forgetfulness; (3) Mrs. Harritt testified that efforts were made to compromise the personal injury actions before judgment was obtained in them, but the attorney who represented Harritt testified that no effort was made until after the judgment had been obtained; (4) Mrs. Harritt testified that the circumstances which precipitated the execution of the three deeds was Harritt's purchase of the second Hudson automobile, but the following facts question her state-

ment: (a) the second Hudson was bought April 1 and the deeds were not executed until May 19; (b) Harritt swore, in part, ''she didn't want her property tied up in litigation''; and (c) human experience suggests strongly that the near approach of the day of trial of claims aggregating many thousands of dollars would exert a much stronger influence toward the execution of the deeds than Harritt's purchase of a $325 automobile; (5) Mrs. Harritt created the impression that the week's estrangement occurred in 1928, while Harritt testified that it occurred in 1926, before the Hudson was purchased.

When the transaction is tested by reason it seems evident that the defendants are asking the man upon the bench to believe where he would doubt if upon the street. Very likely Harritt's purchase of the first Hudson caused discord and a desire for a separation of their titles; however, he had owned cars for 12 years. But, apparently, all talk of a property settlement stopped when he gave over the management of his monthly wages to his wife. Thirteen months now passed before the deeds were executed. The events which immediately preceded the execution of the deeds were the loss of the case against Fawk which foreshadowed the loss of the four cases against Harritt, and the swift approach of the day of trial. We now find the Harritts rushing back to the farm, and at the same time proceeding with the conveyances which rendered Harritt execution proof.

Notwithstanding these circumstances, which have a strong tendency to question the credibility of the Harritts and to impeach the transfer of the two properties, it is possible that the transaction may have been as they testified, but the trial judge, in whose judg-

ment we have confidence, found otherwise, and a few moments spent in observing the witnesses often produces a more reliable opinion as to the truth than hours spent in reading reams of evidence. We conclude that the testimony in support of the alleged property settlement is not of that cogent character required to support deeds affected with badges of fraud. But the defendants argue that this court is compelled to accept as true the testimony of the Harritts because it was the plaintiff who called them to the stand. They contend that a party who produces a witness certifies to his credibility, and quote the following extract taken from *Sitton v. Peyree,* 117 Or. 107 (241 P. 62, 242 P. 1112):

"To establish his cause, plaintiff placed each of the then co-defendants upon the witness stand. They failed to support his averments of fraud. 'When a party producing a witness calls him to the stand, he thereby represented him to the court as worthy of credit, or at least not so infamous as to be wholly unworthy of it.' State v. Steeves, 29 Or. 85, 103 (43 P. 947, 952). To like effect is Gowan-Lenning-Brown Co. v. Kingman [116 Or. 650] (242 P. 351), decided by this court on January 12, 1926. We find a similar situation in the case of Chance v. Graham, 76 Or. 199 (148 P. 63). In that case the plaintiff called the defendant as a witness. Concerning such procedure, this court, speaking through Mr. Justice BURNETT, said: 'The plaintiffs called as their first witness the defendant Marion C. Young, thereby vouching for his credibility' ".

■ We notice that the proposition that a party vouches for the credibility of his witnesses has been severely criticized: Wigmore on Evidence (2d Ed.), § 898. Moreover, an effort to bolster a witness's credibility by giving him the benefit of a legal makeweight is to make the outcome of lawsuits depend upon legal

exercises rather than facts. But if it can be said that the plaintiff vouched for the credibility of the Harritts, whom he accused of fraud, it must be evident that his vouching was a coerced one—coerced by his need of evidence and the fact that the defendants were the only sources of information to which he had access. Again, their account of the alleged property settlement plan of April, 1929, and their testimony that the deeds were the consummation of that plan, was developed upon cross-examination which we do not believe was within the scope of the direct examination. Be this as it may, no amount of vouching can compel a court to accept as truthful that which other facts indicate is unreliable.

It follows from the foregoing that the decree of the circuit court is affirmed.

BEAN, C. J., concurs.

BROWN and CAMPBELL, JJ., concur in the result.