Argued at Pendleton October 28; affirmed December 8; rehearing denied December 29, 1936

## MOLL ET AL. *v.* TURNBOW ET AL.

(62 P. (2d) 941)

Department 2.

*Will M. Peterson,* of Pendleton, and *Will H. Masters,* of Portland (Peterson & Peterson, of Pendleton, and Will H. Masters, of Portland, on the brief), for appellants.

*George R. Lewis,* of Pendleton (Lewis & Isaminger, of Pendleton, on the brief), for respondent Moll.

BAILEY, J. The defendants J. E. McCormmach and Wentworth & Irwin, Inc., appeal from the decree of the circuit court annulling and declaring void certain transfers of personal property connected with transactions between the appellants and the defendants F. W. Turnbow and Hazel Turnbow, his wife, as in fraud of certain creditors of said F. W. Turnbow, to wit: plaintiff C. A. Moll and interveners State of Oregon and Carl Detering, receiver of King Brothers, a corporation.

Prior to the institution of this suit C. A. Moll, on March 21, 1935, commenced an action against the defendant F. W. Turnbow to recover on a promissory note for $786.22 given by said Turnbow to the plaintiff, and immediately caused to be attached a Moreland truck and a Wentwin trailer in the possession of McCormmach and claimed to belong to Turnbow, and in addition garnished any and all property in the possession or control of McCormmach belonging to the defendant Turnbow.

Upon the claim of said McCormmach to be the owner of said truck and his making a return that he had no property in his possession belonging to Turnbow this proceeding in the nature of a creditor's suit

was instituted by Moll against all the defendants hereinabove named. Thereafter the state of Oregon, acting by and through Frank C. McColloch, public utilities commissioner, and Carl Detering, receiver of King Brothers, a corporation, respectively filed petitions to intervene as plaintiffs in the proceeding. At the time of filing these petitions each of said intervening petitioners was a judgment creditor of the defendant F. W. Turnbow in the sum of approximately $300 and $250 respectively, upon which judgments execution had been issued and returned wholly unsatisfied.

■ The facts involved in the present suit are somewhat complicated, but are substantially as follows: In the early part of 1933 the defendant F. W. Turnbow purchased from Wentworth & Irwin, Inc. (hereafter to be mentioned as the defendant corporation), a GMC truck and a trailer of make or manufacture not clearly shown by the evidence. This equipment was used by Turnbow on the highways as a contract carrier under a permit to operate issued by the public utilities commissioner of the state of Oregon. In the early part of August, 1934, Turnbow traded the truck and trailer to T. A. Reid for a Moreland truck and a Wentwin trailer, the same truck and trailer attempted to be attached by Moll in his above-mentioned action against the defendant Turnbow. At the time of Turnbow's acquiring this Moreland truck and Wentwin trailer the Pacific Finance Corporation had a lien against the same either by chattel mortgage or conditional sale contract, amounting to several hundred dollars, and for that reason retained certificate of title to the equipment.

Shortly after Turnbow had acquired this truck and trailer from Reid the defendant corporation installed a new motor in the truck and Turnbow executed to the

corporation a chattel mortgage on the truck and trailer for $764.77, which chattel mortgage was dated August 7, 1934. This instrument was filed for record in Umatilla county soon thereafter and up to the date of the trial the mortgage had not been satisfied of record, although it was admitted by the defendant corporation that the debt had been paid.

Turnbow had in his employ for many months prior to October 10, 1934, a man named Bob Marshall, as operator of his truck. On that date a pretended sale of the Moreland truck and Wentwin trailer was made by the defendant Hazel Turnbow to said Bob Marshall for the sum of $3,200, the purchase price evidenced by six notes of $500 each and one of $200 and secured by a chattel mortgage on the truck and trailer, which mortgage was filed for record on the date of its execution. A permit was issued by the public utilities commissioner to Marshall on October 29, 1934, to operate as a contract carrier in interstate business.

The preponderance of the evidence is that this attempted transfer of the truck and trailer was merely for the purpose of permitting F. W. Turnbow to continue to operate as a contract carrier in the name of Marshall, because Turnbow's own permit had been revoked and he was continually having trouble with the utilities commissioner. The money which was received in operation by Marshall was turned over to the Turnbows and nothing was ever credited by Turnbow or his wife on the notes given by Marshall to Mrs. Turnbow. Some of the items which make up the plaintiff Moll's claim against Turnbow were charges for gasoline and oil furnished by him while the equipment was being operated by Marshall at the instance and request of F. W. Turnbow. Near the close of the year 1934 or early in 1935 Marshall apparently abandoned

the truck and trailer to Turnbow and left his employ. At the time of the trial no one knew his whereabouts.

Possession of the truck was taken by F. W. Turnbow and on January 8, 1935, he filed an affidavit with the secretary of state for the purpose of obtaining licenses for 1935 for the truck and trailer, in which affidavit he referred to the transaction between himself and Reid and stated that he had been the owner and in possession of the truck and trailer and operating the same ever since said trade, but that said Reid, because of difficulties over the transaction between them, had refused to deliver the registration receipt to him and that the said registration receipt and certificate were retained by Pacific Finance Corporation. On January 14, 1935, temporary license certificates were issued in the name of F. W. Turnbow. Nothing further seems to have occurred with relation to the issuance of licenses or license plates for the truck and trailer until several months later.

Prior to March 19, 1935, the plaintiff Moll made several attempts to collect the account owed him by the defendant F. W. Turnbow, amounting to $786.22. About a week or ten days before the last mentioned date negotiations were had between Moll and Turnbow for the sale of the truck and trailer to Moll at a price of $2,000 cash, plus cancelation of the indebtedness due Moll from Turnbow. At that time Moll's son telephoned Charles G. Irwin, general manager of defendant corporation, stating that negotiations were being had and asking the amount which Turnbow owed on the equipment. The contemplated purchase by Moll was not consummated, and in the morning of March 19 Moll requested Turnbow to pay the account or give him a note signed by Turnbow and his wife for the amount owing Moll. Turnbow departed, and about 2 or 3 o'clock

in the afternoon returned and executed a note for the amount of the debt to Moll, but stated that his wife had refused to sign. After Turnbow left Moll's place of business in the morning of March 19, he and Mrs. Turnbow went to the ranch of J. E. McCormmach and prevailed upon McCormmach to purchase the truck and trailer for $2,500, with a cash payment of $600 and 15 notes of $126.66 each for the balance, payable consecutively, one each month, to Hazel Turnbow, wife of F. W. Turnbow. At the same time a chattel mortgage on the truck and trailer for the unpaid balance was executed by McCormmach in favor of Hazel Turnbow. This transaction between the Turnbows and McCormmach seems to have taken place during the interval between the two conferences which Moll had with Turnbow on March 19. Early in the evening of March 19, after the transaction with McCormmach had been completed, or early the next morning, Turnbow and his wife went to Portland and began negotiations of some nature with the defendant corporation.

The note which Turnbow gave to Moll was payable one day after date, and on March 21 Moll, apprehensive that Turnbow was not acting in good faith and was seeking to avoid payment of his debt to Moll, instituted the action hereinabove mentioned, to recover on the note. On the same day J. B. Moll, son of the plaintiff, on his behalf telephoned to Mr. Irwin and advised him of the attachment against the Turnbow truck and trailer and the garnishment of McCormmach, and further advised him that Turnbow apparently was attempting to put his property beyond the reach of his creditors. Mr. Irwin asked Moll to delay until the next day to do anything, as he desired to consult Turnbow, who on that day, he said, was in Salem. In the evening of March 21 the plaintiff sent a telegram to the defendant corpo-

ration in the following language: "We have attached the Frank Turnbow truck. Will be ready to make settlement with you in the next few days." On March 25 the attorney for the plaintiff wrote the defendant corporation, calling attention to the attachment of the truck, the garnishment of McCormmach and the transaction between Turnbow and McCormmach. This letter was received by the defendant corporation on March 26. On that day the defendant corporation procured Hazel Turnbow to sign a purchase order for a used GMC truck and a Wentwin trailer for the sum of $4,001.25, the same truck and possibly the same trailer that had formerly been traded to Reid for the Moreland truck and Wentwin trailer. This order was accepted by Irwin on behalf of the defendant corporation. No down payment was made by Mrs. Turnbow at the time this order was signed, but the notes given by McCormmach to her, amounting to $1,900, were delivered to the corporation, and in addition the mortgage and accompanying assignment. This assignment was executed at Pendleton on March 25, the same day that the mortgage was recorded. Written across the order signed by Hazel Turnbow and forming a part thereof is the following notation: "This acknowledges receipt of mortgage and notes in the amount of $1,900 nineteen hundred no/100 dollars, covering Moreland truck with GMC motor No. 2428099 and chassis No. 28013, and Wentwin trailer No. F5013, signed by J. E. McCormmach, payable in fifteen notes of $126.66 and interest at eight per cent. As payments are received on this mortgage and note proceeds are to be applied first on F. W. Turnbow's acc't, after this is paid amounts received are to be applied on Hazel Turnbow's note on GMC truck and trailer ordered herewith."

The purchase price of this truck and trailer was to be paid at the rate of $222.30 per month, and delivery was to be had on April 2, 1935. On April 6 a chattel mortgage on the truck and trailer was executed by Hazel Turnbow for the sum of $4,414, and on or about that date the truck and trailer were turned over to her husband.

According to Mr. Irwin's testimony, F. W. Turnbow was more active than his wife in the negotiations for the truck and trailer which were, to use Mr. Irwin's words, bought by Mrs. Turnbow but to be operated by her husband. In his testimony Mr. Irwin was very indefinite as to what really did occur between himself and the Turnbows and what his telephone conversation was with the plaintiff's son, J. B. Moll.

After McCormmach had been served with notice of garnishment he made a return to the effect that he owed F. M. Turnbow $1,900 evidenced by notes. A few days later, after consulting an attorney, he made an amended return to the effect that the notes were given to Hazel Turnbow.

The decree appealed from canceled and held void the attempted sale and transfer of the Moreland truck and Wentwin trailer from Hazel Turnbow to McCormmach, and canceled and annulled the mortgage for $1,900 from McCormmach to Hazel Turnbow. The court further impressed upon the truck and trailer a lien in the sum of $600 in favor of McCormmach, specifying that said $600 represented the amount paid by McCormmach in satisfying the lien of a chattel mortgage on said equipment from Turnbow to Wentworth & Irwin, Inc. The decree further held that certain real property standing in the name of Hazel Turnbow and an Olds automobile claimed by her, neither of which

is involved in this appeal, were the property of F. W. Turnbow.

From the record in this case the conclusion is inescapable that F. W. Turnbow, with the aid and assistance of his wife, Hazel Turnbow, was attempting to hinder and delay his creditors in the recovery of the amounts due them from Turnbow. Mrs. Turnbow did not own the Moreland truck and Wentwin trailer or any of the other property which is involved in the case and claimed by her. By having the real property conveyed to her and claiming that the personal property belonged to her Turnbow was attempting with her assistance to put all his property beyond the reach of his creditors.

F. W. Turnbow's testimony was very unsatisfactory, evasive and contradictory. Mrs. Turnbow did not appear as a witness, and the explanation given was that she was ill at home and unable to attend court, although the evidence is undisputed that during the time when she was reported to be too ill to leave home she was operating her automobile unaccompanied on the streets of Pendleton.

It is, we believe, practically conceded by the appellants that the conveyance of real property to Mrs. Turnbow and the pretended transfers of personal property by Turnbow to her were fraudulent, intended only to make it appear that Mrs. Turnbow was the sole owner of all the property involved in this suit. It is not necessary to review further the testimony on this feature of the case.

Mr. J. B. Moll, plaintiff's son, testified that McCormmach had been operating the Moreland truck and Wentwin trailer for about three weeks prior to March 19 and that Turnbow had told him that McCormmach was leasing the truck from him and paying $25 a trip.

McCormmach and Turnbow, however, testified that McCormmach had been negotiating for six weeks or two months for the purchase of the truck and trailer and that the price asked by the Turnbows during that time was $3,000. During the negotiations Turnbow had offered to sell the truck and trailer to Moll for $2,000 and the cancelation of a debt of $786.22 due from him to Moll. The $600 claimed to have been paid by Mc-Cormmach to Mrs. Turnbow on March 19 was testified by McCormmach to have been in two checks from H. M. Graham or the Bentley-Graham agency and payable to the order of Hazel Turnbow as money belonging to McCormmach.

The defendant McCormmach in his answer alleged that the Moreland truck and Wentwin trailer were purchased by him from Hazel Turnbow in good faith and for a valuable consideration. He did not, however, allege that he had purchased the truck and trailer without knowledge of the fraudulent transfer of that equipment from F. W. Turnbow to Hazel Turnbow, his wife. The trial judge, in a written opinion, expressed the view that since McCormmach did not allege that he had purchased the equipment without notice of the fraudulent dealings between the husband and wife, he thereby admitted that he had not acquired the truck and trailer without such knowledge. After the trial judge had rendered his opinion McCormmach asked permission to amend his answer by inserting therein the following clause: "and without notice of the fraudulent intent of any person". This application was denied because the matter had already been submitted to and decided by the court. It was claimed by McCormmach that he had without objection testified that he had no knowledge of any fraudulent intent on the part of the defendants Turnbow; that the suit had been tried on the theory

that he had no such notice; and that therefore, if it was necessary to allege that he purchased the equipment without notice, the court erred in not allowing the amendment.

■■ On direct examination McCormmach testified that he did not know at the time of the transaction that F. W. Turnbow was indebted to the plaintiff, C. A. Moll; and on cross-examination he testified that he did not know that Turnbow was having trouble with Mr. Moll or any other of his creditors, and that the first knowledge he had of that fact was when the writ of attachment was served on him. In view of the fact that McCormmach was purchasing the truck and trailer from Hazel Turnbow, fraudulent transferee of the debtor, it was necessary for him to allege and prove that he was a *bona fide* purchaser for value and without notice of such fraudulent transfer. However, the insufficiency of the pleadings in this respect does not appear to have been raised by demurrer, and no objection was offered to the testimony of McCormmach. This and the further fact that plaintiff's counsel on cross-examination of McCormmach brought out the testimony that McCormmach did not know of Turnbow's intent to defraud his creditors lead us to treat McCormmach's answer as containing the necessary allegation as to lack of notice.

*In Weber v. Rothchild,* 15 Or. 385, 390 (15 P. 650, 3 Am. St. Rep. 162), this court, with reference to the necessary pleading and proof on behalf of a defendant charged with participation in the fraudulent acts of a debtor, observed:

"It is the *bona fide* purchaser for value, in good faith and without notice, who is entitled to the protection of a court of equity, as against the person sought to be defrauded by the conveyance. And this brings us to the examintion of a very important question in this case,

and that is this: Is the plaintiff required to prove a negative, by showing that the defendant did not pay a valuable consideration, or, having shown the fraudulent intent and purpose of the grantor, may he stop and require the grantee to prove that he paid value, in order to protect his title? Here the defendant Rothchild has alleged facts in one part of his answer tending to show that he is a *bona fide* purchaser for value without notice of this property, but he has offered no evidence whatever on those issues. The plea of a *bona fide* purchaser for value as here alleged is an affirmative defense interposed by the defendant, and in this connection it is not perceived that it differs from other affirmative defenses. The party having the affirmative of the issue must offer evidence to support it.''

When the plaintiff had established the fact that Hazel Turnbow was not the real owner of the truck and trailer and that the pretended transfer of this equipment to her by her husband was with the purpose of hindering, delaying and defrauding his creditors, it then became necessary for McCormmach to allege and prove that he was a *bona fide* purchaser for a valuable consideration and *without notice: Barr v. Minto,* 65 Or. 522, 526 (133 P. 639); *Bond v. Ellison,* 80 Or. 634, 637 (157 P. 1103); *Garnier v. Wheeler,* 40 Or. 198 (66 P. 812); *Farmers' National Bank v. Renfro,* 94 Or. 260 (184 P. 564); *Hill v. Harritt,* 140 Or. 86 (12 P. (2d) 1021). In this instance the transfer which is attempted to be set aside is not from F. W. Turnbow direct to McCormmach, but from Hazel Turnbow, to whom, according to the record, the truck and trailer had previously been transferred by her husband to hinder, delay and defraud his creditors. Since Hazel Turnbow's title to the property was defective and could have been set aside by Turnbow's creditors, the burden was on McCormmach to prove that he was a *bona fide* purchaser from her for value and without notice.

■ McCormmach, by designating Hazel Turnbow as payee in the notes and executing the chattel mortgage to her to secure the same, was aiding and assisting Turnbow and his wife to conceal the assets of F. W. Turnbow and to make it more difficult for Turnbow's creditors to satisfy their claims out of his property. Although McCormmach stated in his testimony that he had been negotiating with the Turnbows for a considerable period of time, nevertheless when Moll threatened action for his debt the deal was suddenly consummated at a reduction of $500 from the price the Turnbows had been demanding for the equipment. Most of the negotiations on behalf of Turnbow were conducted by himself and apparently no attempt was made by McCormmach to determine who held the certificate of title to the truck or how Mrs. Turnbow had become the owner of it. McCormmach was well acquainted with the Turnbows and knew that Turnbow had been operating the truck in his business. After the commencement of this suit against McCormmach and Wentworth & Irwin, Inc., the complaint in which charged these fraudulent dealings, McCormmach continued to make payments on the installment notes as they became due and had paid seven such notes at the time of the trial. It seems incredible that these payments would have been made after the institution of this suit, with the holder of the notes party to the proceedings, unless pursuant to an understanding between Wentworth & Irwin, Inc., and McCormmach whereby the latter would be protected in the event of an unfavorable decision.

McCormmach has failed, in our opinion, to establish that he purchased the truck and trailer here involved without notice of the fraudulent intent of F. W. Turnbow in transferring the equipment to his wife to hinder, delay and defraud his creditors. In arriving at

this conclusion we have considered not only the testimony of McCormmach but all the circumstances connected with the purchase of the equipment by McCormmach, and his subsequent actions.

■ The defendant Wentworth & Irwin, Inc., we believe not only had knowledge of the intent of F. W. Turnbow to defraud his creditors, but actively participated with him in effectuating his purpose. This corporation was notified by the plaintiff of the institution of the action against Turnbow, the attachment of the truck and trailer and the garnishment of McCormmach. It knew that Mrs. Turnbow did not own the truck. In dealing with the Turnbows the defendant corporation sought to collect the open account which it had against Turnbow, amounting to $675.76, and in addition to make a resale to Turnbow, through Hazel Turnbow, of a used truck and trailer which had formerly been sold by it to him.

As a witness for the defendant corporation its general manager, Mr. Irwin, remembered very little of what was told him over the telephone by Moll. He was also very indefinite in his testimony concerning other important features of the case. He did not remember whether he had discussed with the Turnbows their financial condition or not. In a letter to the attorney for Moll he stated that he had investigated the transfer of the Moreland truck and Wentwin trailer from Mrs. Turnbow to McCormmach and that he had talked with McCormmach on several different occasions about the transaction. McCormmach testified that he had never discussed the matter with Mr. Irwin, and as a witness Mr. Irwin could not say definitely that he had talked about it with McCormmach. Irwin further stated in the letter that after making an investigation he was of the

opinion that McCormmach and Moll were purchasing the truck together.

The McCormmach notes were not transferred to the defendant corporation until March 26, and the mortgage from Mrs. Turnbow on the truck and trailer which were claimed to have been resold about that date to Mrs. Turnbow was not executed until April 6, 1935. Mr. Irwin admitted that the sale of the GMC truck to Mrs. Turnbow was unusual in that no down payment was required. He further testified that he gave Mrs. Turnbow no credit on the McCormmach notes until the same were paid.

It is argued by counsel for Wentworth & Irwin, Inc., that a debtor has a right to prefer one creditor over all his other creditors. The defendant corporation, however, was not a creditor of Mrs. Turnbow and she was under no legal obligation to pay her husband's debt to that corporation.

Without reviewing the evidence further, or the law applicable thereto, we conclude that the decree of the circuit court was proper in view of the facts in the case, and it is therefore affirmed.

RAND, BELT and BEAN, JJ., concur.