Argued March 5; reversed June 30; rehearing denied
September 29, 1942

# MURRAY *v.* WILEY ET AL.

(127 P. (2d) 112, 129 P. (2d) 66)

Before Kelly, Chief Justice, and Belt, Bailey, Lusk, Rand, Rossman and Brand, Associate Justices.

*Ralph R. Bailey,* of Portland (Maguire, Shields & Morrison, Hugh L. Biggs, and Donald K. Grant, all of Portland, on the brief), for appellant.

*W. S. Wiley,* of Klamath Falls (G. Q. D'Albini, of Klamath Falls, on the brief), for W. S. Wiley, G. Q. D'Albini, and Marie N. D'Albini.

*D. V. Kuykendall,* of Klamath Falls (Kuykendall & Kuykendall, of Klamath Falls, on the brief), for Mary L. Moore, Merle S. West, Emma West, Charles J. Martin, Lynna Martin, Thomas B. Watters, and Evelyn Watters.

BRAND, J. It is undisputed that in August, 1932, the plaintiff was indebted to the defendant attorneys in a substantial sum, on account of work performed by them in connection with litigation in which plaintiff was then interested.

In August, 1932, the plaintiffs, Murray and wife, were the owners of the Murray building, subject to the Pacific Savings and Loan Association mortgage, and of the Keystone Apartments on 8th street, in the city of Klamath Falls, which was also subject to a first mortgage. On or about August 1st, the plaintiff, Murray, and the defendant attorneys entered into discussions concerning the disposition of these two properties. There is a conflict of testimony as to who first suggested the solution of the problem, but during that month and under the advice and direction of the defendant attorneys two corporations were organized, the Conger Corporation and the Keystone Building Company. The defendants, Wiley and D'Albini and Mrs. D'Albini, were the sole stockholders and directors in each of said corporations. The capital stock of the Conger Corporation was $5,000.

On August 20, 1932, the plaintiffs conveyed the Murray building to the Conger Corporation, the transaction being handled in the following manner: Wiley and D'Albini borrowed $5,000 from the bank and deposited the same to the credit of the Conger Corporation in purported payment of the stock thereof. The Conger Corporation then issued its check to E. J. Murray in the sum of $5,000 as purported consideration for a deed of the property to the corporation, whereupon Murray paid the same $5,000 to the bank in liquidation of the bank's loan to Wiley and D'Albini, whose notes were returned to them. Murray also paid to the bank $10 for the use of the money which had been loaned to the defendant attorneys. An identical transaction took place with reference to the Keystone Apartments, which the plaintiffs conveyed to the Keystone Building Company, and in that instance also $5,000

was borrowed by the defendant attorneys from the bank, paid to the Keystone Building Company in purported payment of the stock thereof, then paid by the Keystone Building Company to Mr. Murray, who in turn paid the obligation of the defendant attorneys at the bank.

It is the defendants' contention that the simple circulation of the two checks closed the transaction and placed the title to both properties absolutely in the respective corporations. It is difficult to harmonize this contention with defendants' claim that the Murray building was transferred in payment of fees owing the defendant attorneys. The fictitious transaction involving the circulation of the two checks for $5,000 was obviously for the purpose of making it appear that the Conger Corporation had purchased the plaintiff's interest in the Murray building for $5,000 and had likewise purchased the plaintiff's interest in the Keystone Apartments for a like sum. If the transaction was in fact a conveyance of the property in payment of the indebtedness owed, a safer and more candid procedure would have been to recite the cancellation of plaintiff's debt as the consideration for the deed.

The defendant, Wiley, as a witness acknowledged that he did not recall having given any receipt to the plaintiff indicating the payment of the fees.

Again, the testimony of the defendant attorneys establishes that the Keystone property was transferred to the Keystone Company by a transaction identical to that involved here, yet shortly after March 23, 1936 (the date of the sale to Watters et al.), the defendant attorneys turned over the Keystone property to Mr. Hannon merely on an order signed by Murray.

Again, Wiley testified as follows:

"Q. May I ask you this further question: Did you make the statement at any time that this property was deeded to you in satisfaction of attorney's fees for services rendered prior to August, 1932, the date of the conveyance? * * *

"Q. I am simply asking you if you made that statement?

"A. I have no such knowledge, I do not recall."

Plaintiff, Murray, testified positively that at the time of the transfer of the property to the Conger Corporation in 1932 the defendant attorneys promised to reconvey the property to him, that the understanding was that this was to be done as soon as his indebtedness was cleaned up and that the defendant attorneys never asserted a right to the property exclusive of the plaintiff until a few days before the expiration of the right of redemption. Defendants, Wiley and D'Albini, on the contrary, testified that the ownership of the property was in the Conger Corporation, and Mr. Murray was to be out of it, that the property was to belong absolutely to the corporation, that Murray was to have nothing to do with it and that Murray was advised of and agreed to that proposal by telephone.

In view of this conflict of testimony, we must examine the surrounding circumstances and the subsequent conduct of the parties. While the defendants deny categorically that there was any agreement at the time of the conveyance that the property was to be considered as security, still the record is replete with evidence that subsequent to the date of the conveyance the defendant attorneys did recognize the right of the plaintiff to a reconveyance of the property upon payment to them of the plaintiff's indebtedness.

Wiley testified:

"A. The corporation had been found [formed?] and the management of the property; and after that Mr. Murray wanted to know if he couldn't get the property back, wanted to know if he couldn't pay an amount equal to the fees that he owed before the corporation was formed, it was about that way.

"MR. BIGGS: If he could do what?

"A. If he could pay an amount of perhaps what he owed us in fees previous to the corporation being formed.

"Q. Was there any adjustment made as to the fees at that time?

"A. Not at that particular time; there was about a month later.

"Q. All right. At that particular time that I am referring to, Mr. Wiley, you sent a bill to Mr. Murray for $550.00; was that an adjustment of the former bill or was that amount the amount of the fees due you.

"A. Both Mr. D'Albini and I had agreed to transfer the property back to him if he would pay us something.

"Q. He sent you $550.00 as the amount to be due to you, is that correct?

"A. He had been claiming that he had no money, or very little money and he was hoping to collect the judgment in the Maloney case at that time, and I knew he didn't have very much; and it was in February following that he sent me a note for $550.00, but I didn't regard that as being given to me as discharging anything he had owed me."

■ Respecting the amount of the note, there is an apparent error either on the part of the witness, or, as we think, upon the part of the court reporter. There was introduced in evidence as plaintiff's exhibit "F" a promissory note signed by E. J. Murray and drawn to the order of Wilson S. Wiley, in the sum of $750

and bearing the date of February 15, 1933. There was also received in evidence a similar note signed by E. J. Murray in the sum of $935 payable to the order of G. Q. D'Albini, which was also dated February 15, 1933. The substantial difference between the testimony of the plaintiff and that of the defendant attorneys lies only in this: That the plaintiff claimed that his right to a reconveyance of the property upon payment of the debt was discussed and agreed to at the time of the conveyance to the Conger Corporation, whereas the defendant attorneys contend that the matter was first discussed about thirty days later. In any event, the evidence establishes that shortly after the conveyance to the Conger Corporation the parties definitely agreed that the plaintiff would have the right to a reconveyance upon payment of the debt. Prior to February 15, 1933, the plaintiff asked the defendant attorneys to scale down the amount of his indebtedness to them as far as possible and to send him a bill setting forth the amounts with which they would be satisfied. The defendant attorneys did so, Mr. D'Albini claiming a balance of $935 and Mr. Wiley $750. They testified that they expected cash but that they only received promissory notes. The undisputed evidence is that they accepted and received the promissory notes and have retained them to this date. The amounts proposed by the defendant attorneys as a compromise settlement represented plaintiff's indebtedness to them for services rendered prior to the date of the conveyance of the property to the Conger Corporation. The acceptance and retention of the notes is persuasive evidence that the debt continued after the conveyance. Defendant attorneys seem to have misconceived their legal rights in this and some other respects. They may have considered the transaction a conditional sale

rather than a mortgage. Such misconception may have been honest, but it does not change the essential nature of the transaction.

Defendant, Wiley, testified concerning the deed to the Conger Corporation:

"A. I did not regard it as security; it was our property. We were to reconvey it to him if he could have gotten some money, yes sir.

"Q. That was in the agreement?

"A. Yes sir. I felt that the Conger Corporation had the last say."

Again Wiley testified:

"A. He gave us a note for some services rendered prior to the transfer of this property to the Conger Corporation; he gave us a note for those services after the corporation had been formed. That is the only compensation or payment of any kind that was made."

Concerning the note which he received from the plaintiff, Mr. Wiley also testified:

"A. I do not regard the giving of a note as a settlement in payment of the obligations. That is what I meant to say.

"Q. You say that the indebtedness continued?

"A. The indebtedness, yes, until the re-purchase of the property."

Concerning the first date on which the defendant attorneys conceded that it was agreed that Murray should have the right to a reconveyance of the property upon the payment of the debt, Mr. D'Albini testified:

"Q. Some time after the formation of the Conger Corporation did you have occasion to have any conversation with Mr. Murray with regard to the Conger Corporation? * * *

"Q. Shortly after August, approximately after August, after the Conger Corporation was formed.

"A. Yes, shortly after the deed had been filed * * *.

"A. About the middle of September * * * Mr. Murray said to me: 'I would like to have the privilege if I can ever raise the money to pay you what I owe you to get my property back.' I told him that as far as I was concerned that if he could pay me off what he owed me I would be tickled pink to turn the property back to him.

"Q. After you had told Mr. Murray that, that so far as you were concerned you would be willing to reconvey the property to him in case he should pay you what he had owed you for services, then after that did he ever make any payment to you?

"A. No, he did not; but it was in the fore part of February, 1933, that he came to the office one morning and said: 'I am expecting to get some money so I came up to settle with you; I want you to take your pencil and sit down and see how small you can make your bill, I don't know just how much I owe you.' And he said: 'I do not expect to get much money, I am a poor man.' So I sat down with a pencil and made him a bill. In the conversation he also said to give him credit for the $500.00 that he sent me at Medford; and he said that he would settle that Wyoming deal soon. I sat down and made him a bill and made it very small on the services that had been rendered him and gave him credit for the $500.00; that left a balance of $935.00.''

Again, Mr. D'Albini, testifying concerning the Murray building and also the Keystone property, said:

"A. They were both virtually in distress and we thought we could save one or the other, if he lost one we would save the other."

Defendant, Wiley's, explanation of the receipt of the note for $750 (exhibit "F") was similar to that of the defendant, D'Albini. He testified:

"A. Well, the circumstance under which I received this note was that Mr. D'Albini had told me of the conversation he had had with Mr. Murray after the corporation had been formed and going about a month, that Mr. Murray had told him that he would like to have the credits and get a reconveyance of this property back to him if he was able to pay us the attorneys fees he owed us, and with that knowledge Mr. D'Albini advised me of that conversation; and he advised me also that he had told Mr. Murray that he was perfectly willing so far as he was concerned to have it properly conveyed to Mr. Murray or at least, speaking for himself, transferred all the stock in that corporation to Mr. Murray; and as I recall it, I had told Mr. D'Albini at that time it was perfectly agreeable to me to do that. I hadn't wanted the property in the first place to start with.

"Q. In regard to this note, who delivered the note to you, if you recall?

"A. Well, this note was delivered to me about the date it bears, February 15, 1933, which was several months after Mr. D'Albini told me about this conversation with Mr. Murray, * * *."

The case was argued in this court by the defendant Wiley. We quote from the final portion of that argument:

"At appellant's request, Wiley made out a 90-day note for D'Albini for $935 and a 90-day note for himself for the sum of $750. Appellant signed the Wiley note and gave it to him, but D'Albini said he got his note through the mails. He had expected cash and not a note. These notes were never paid."

(Question by Justice Belt:) "Why didn't you tell him that this deed had been given in satisfac-

tion of the indebtedness and everything was squared up and there was no object in having the notes?''

(Answer) ''If he had asked for the deed we would have given it back to him.''

There were numerous circumstances which support the conclusion that the parties had at all times recognized the right of the plaintiff to a reconveyance of the property upon the payment of his indebtedness even though they may not have realized that the conveyance was in legal effect a mortgage. The evidence shows numerous efforts on the part of the plaintiff, Murray, to refinance the property and to secure from the first mortgagee an extension of time for that purpose, all of which efforts occurred after the conveyance of the property to the Conger Corporation, and they continued after the sale on foreclosure and down to the month of March 1936. The evidence discloses that the plaintiff, Murray, received the rent from the Woolworth Company, tenant of the Murray building, at least for the months of September and October 1932, and that subsequent to the conveyance to the Conger Corporation, he retained at least one month's rental to pay for repairs upon the building. Mr. D'Albini testified that he kept in touch with Mr. Murray concerning the property and its financial condition, and the correspondence of the parties is to the same effect.

On September 17, 1934, after the Pacific Savings and Loan Association had commenced suit to foreclose its first mortgage, but prior to the sale on foreclosure, the defendant, Wiley, wired the plaintiff as follows:

''After considerable negotiations think I can sell Conger building for seventy-eight thousand stop total delinquencies about twenty two thousand total indebtedness approximately seventy two thousand stop we will split with you difference be-

tween selling price and indebtedness stop no chance to secure better price and fear if not acted upon immediately he will try and buy at foreclosure sale for the debt stop we are not in position to delay further the foreclosure proceedings stop wire me immediately.''

Again, in February 1936, and subsequent to the sheriff's sale on foreclosure, the defendant, Wiley, wired the plaintiff as follows:

"Liby here from Tacoma would recommend and urge you be in Klamath Falls Tuesday morning wire answer.''

Pursuant to that wire the plaintiff went to Klamath Falls and discussed taking over the property from the Pacific Savings and Loan Association. Negotiations between the plaintiff and the defendant attorneys continued subsequent to the sheriff's sale on foreclosure of the first mortgage, as evidenced by a telegram from Wiley and D'Albini to the plaintiff, Murray, dated February 26, 1936, as follows:

"Woolworth or associates best offer two thousand for equity of redemption we split one third each statutory notices and time required to close complicated deal preclude further delay feel there is insufficient time for reconstruction loan and Libys proposal impracticable must accept or reject tomorrow morning urge you immediately wire your approval.''

To this the plaintiff wired in reply:

"Offer unacceptable stop I will be able to refinance loan.''

On the next day, February 27, 1936, Mr. Wiley wrote to the plaintiff concerning an offer from a Mr. McClure. We quote in part:

"And while we have steadfastly refused to assign the equity of redemption to anyone, without

considering you first, nevertheless you should not expect us to jeopardize our opportunity to realize something on it before the time limitation has expired. * * *

"If we are foregoing the offer of Mr. McClure, then it would seem only fair that you meet his offer to us if your deal is lining up, and we shall expect this payment for the equity of redemption, and if not paid by March 3rd next, we shall feel free to assign it to anyone to whom we might be able to deal. * * * And this matter of time was discussed when you were here, and you were very fair about it by agreeing that if you could not conclude your financing soon, you would allow sufficient time for us to protect ourselves in a sale of the equity of redemption.

"We have tried to be more than fair, even agreeing to kick back a few dollars to you, and we have never annoyed you with claims we have against you, knowing you were having as serious a financial struggle as ourselves."

On February 28, 1936, but before receipt of Wiley's letter of the 27th, the plaintiff wrote to the defendant, Wiley, to the effect that he had three "good leads", and that he was going to "watch all three of them and take the first one of them that makes certain of coming through." He concluded as follows:

"Now, I wish you would—that is you and D'Albini—get together and let me know what I will owe you up to and including the handling of all proceedings connected with the care of the new mortgage, and I am going to try and get enough cash on the loan I am after to clean both of you up to date. It sure looks good and I am more hopeful than I have been for months."

On March 1, 1936, 22 days before the Conger Corporation sold the right of redemption to the purchasing

defendants, the plaintiff, Murray, having received the letter of February 27th, wrote the defendant, Wiley, as follows:

"* * * There was nothing in that letter that showed that it could have been written by the Wilson Wiley I have known for over a quarter of a century, and while its contents grieved me more than I can express, I shall be glad to forget I ever received it, as I am sure by this time you deeply regret having written it.

"However, it may not be amiss for me to say that this property belongs to Mrs. Murray and me and we are the sole arbiters of its disposition. Nothing has ever been said or done that can, or should, be construed to change this status. When we sell our equity we shall receive what we deem it is worth, otherwise it will not be disposed of.

"As I wrote you, when this refinancing is completed we will be able to secure enough additional money to pay both you and Mr. D'Albini."

■■■ With this background of testimony, we turn to the law. A deed absolute on its face, though knowingly executed, may be shown in equity, by parol, to be a mortgage, without allegations of fraud, accident or mistake. *Conley v. Henderson*, 158 Or. 309, 75 P. (2d) 746 (1938). Such an instrument does not pass the legal title. *Purdy v. Underwood*, 87 Or. 56, 169 P. 536 (1918), and cases there cited. Since it appears that a preexisting debt was not extinguished upon the delivery of the deed, a strong inference arises that the conveyance was intended as security for the debts. *Niehaus v. Shetter*, 78 Or. 447, 153 P. 486 (1915); *Caro v. Wollenberg*, 68 Or. 420, 136 P. 866 (1913). That inference is fortified by the fact that no fresh consideration passed from the grantees to the grantor. The $5,000 round robin was purely a fictitious transaction. A

painstaking examination of the testimony, typical portions of which have been quoted, convinces us that the conveyance to the Conger Corporation was in equity a mortgage.

■ There has been some intimation that the conveyance to the Conger Corporation was in fraud of creditors. No such contention appears in the pleadings. Such a situation, if it existed, would have been inconsistent with the contention of both parties, the defendants claiming that the sale was absolute and the plaintiff that it was in equity a mortgage. It is possible that the distressed condition of plaintiff's finances may have been influential in moving him to make the conveyance, but if, as he asserts, the conveyance was made as security only, he had a right to prefer his attorneys to that extent over other creditors, if done in good faith, even if the mortgage to the defendant attorneys would render the claims of other creditors less easy of collection. *Connel v. O'Connor,* 159 Or. 348, 80 P. (2d) 542 (1938); *Ball v. Danton,* 64 Or. 184, 129 P. 1032 (1913). In fact the claims of other creditors which were disturbing plaintiff shortly prior to the conveyance were all satisfied at a later date.

■ Having concluded that the conveyance to the Conger Corporation was made to secure the plaintiff's indebtedness to the defendant attorneys, we must next inquire whether the legal situation was in any way affected by the fact that the property was conveyed to the Conger Corporation instead of directly to the attorneys. Upon this issue we are in entire accord with the trial judge, who said:

"The piercing of the corporate veil presents no difficulties. The Conger Corporation was Wiley and D'Albini and vice versa."

This is not a case of a conveyance to a corporate trustee having duties different from and independent of those of the beneficiaries Wiley and D'Albini. The corporation was formed for the sole purpose of holding the Murray building. It had no other assets and performed no other functions and was allowed to expire after the conveyance by it to the purchasing defendants. The defendant attorneys owned all of the stock except a qualifying share held by Mrs. D'Albini, and they controlled its every action. The corporation's dealings with the property were such only as Wiley and D'Albini in their discretion caused it to do. Its duties toward the plaintiff, Murray, were such, and only such, as would have been imposed upon Wiley and D'Albini personally if a deed absolute in form had been given directly to them for security purposes. Defendants could not affect the rights of the plaintiff mortgagor by the dummy device of a corporation masquerading as an independent trustee. The corporation was the alter ego of Wiley and D'Albini, and the rights of the plaintiff in the property will henceforth be considered as if the conveyance of August 20, 1932, had been made directly to the defendant attorneys. 1 Fletcher, Rev. and Per. Ed. Sec. 41, et seq.; *Shea v. Leonis,* 14 Cal. (2d) 666, 96 P. (2d) 332; *Security Savings & Trust Co. v. Portland Flour Mills Co.,* 124 Or. 276, 261 P. 432.

■■ It being established that the defendant attorneys were in the position of second mortgagees, we must next determine the effect of the foreclosure of the first mortgage by the Pacific Savings and Loan Association upon the rights of the parties. The defendant attorneys in their brief, after denying that any trust or mortgage relation existed between the plaintiff and themselves, assert that ''if a trust relationship had been formed it was definitely terminated upon the foreclosure sale of

the property to the Pacific Savings and Loan Association." We are of the opinion, however, that the interest of the plaintiff mortgagor was not wiped out by the foreclosure of the first mortgage and ensuing sheriff's sale. If the plaintiff had given to the defendant attorneys or to their corporation an instrument in form a second mortgage instead of a deed, then the defendants would have had at most sixty days from the date of the sheriff's sale within which to redeem (O. C. L. A. 6-1603), but the fact that the Conger Corporation appeared as the record owner placed them in a different position. Under the provisions of the statute, which extend to the mortgagor or his grantee the right to redeem for a period of one year, the defendant attorneys were enabled through the corporation to exercise rights which were not incident to their true position as second mortgagee and which, in equity, belonged solely to the plaintiff mortgagor, who, as between the plaintiff and defendant attorneys, was still the owner of the property. It may be argued that by the sale of the property to the Watters group the defendant attorneys did in effect foreclose the interest of the plaintiff, Murray, and that they realized from the sale no more than the amount of their claim against plaintiff for attorney fees, but if the deed to Conger was in effect a mortgage, then the exclusive remedy of the mortgagee was by a suit in equity to foreclose. The grantee of a deed absolute in form but in equity a mortgage has no right to foreclose by exercising a purported power of sale. O. C. L. A. 9-501; *Thompson v. Marshall*, 21 Or. 171, 27 P. 957; *Marquam v. Ross*, 47 Or. 374 at 423, 86 P. 1 (1906); *Caro v. Wollenberg* (supra); *Libel v. Pierce*, 147 Or. 132, 31 P. (2d) 1106 (1934).

■ Before the property was bid in at the foreclosure sale by the Pacific Savings and Loan Association,

the Conger Corporation held it as a mortgagee in possession, the relation of the parties being analogous to that of trustee and cestui qui trust. *Caro v. Wollenberg* (supra). After the foreclosure sale, under the maxim "Once a mortgage, always a mortgage," it held the right of redemption as security. If it had redeemed, the same maxim would have applied, and if it sold to one chargeable with notice the maxim would again apply, and the right of the mortgagor to redeem would still persist. See by way of analogy *Niehaus v. Shetter* (supra).

Strong reliance was placed by the defendant attorneys and by the trial court on the case of *Marquam v. Ross* (supra), which they cite as establishing the rule that, "A trust necessarily comes to an end when the mortgage is foreclosed." The facts were that Marquam borrowed $300,000, securing it by a first mortgage on certain of his real property. He then borrowed an additional sum from the "title company" and executed to it a deed absolute in form. As a part of the transaction, a declaration of trust was executed wherein the title company agreed to reconvey the property to Marquam upon payment of the first mortgage to the "mortgage company," payment of the money borrowed from the title company, compensation for its services and upon the full performance of numerous other stipulated managerial duties owing both to the mortgagor, to the first mortgagee and to itself. Thereafter, the title company managed the property until, by reason of default, the mortgage company instituted suit to foreclose. The title company answered, setting up its own claims against Marquam and praying for foreclosure of its own lien. After trial, a decree was entered against Marquam foreclosing both the first mortgage and also the lien of the title company and certain other

judgments. The property was ordered sold, the proceeds to be applied according to the priority of the various judgments. At the sheriff's sale, the property was purchased by defendant, Ross, as trustee for the title company, and he in due time received a sheriff's deed. Thereafter Marquam brought suit for the purpose of having defendant declared a trustee for the plaintiff. The controlling question was whether at the time of the sale, the title company bore such a relation of trust to the plaintiff as to disqualify it to purchase (through Ross) at the sheriff's sale. It was held that the conveyance to the title company, although absolute in form was in effect a mortgage. The court said:

"By an absolute deed of trust the grantor parts with the title, which vests in the grantee, unconditionally, for the purpose of the trust with no right of reconveyance to the grantor, but a deed of trust designed as security for money, creates a mere lien, and is in legal effect a mortgage." (Citing Thompson v. Marshall, 21 Or. 171, 29 P. 957.)

It was held that the title company, as a mortgagee in possession, was entitled to purchase the mortgaged property at a public sale. Upon rehearing it was further held that even if the trust agreement conferred upon the title company the power of sale,

"Such sale under the statute could only be made under a decree of foreclosure * * *."

The foregoing statement clearly distinguishes the case of *Marquam v. Ross* from the case at bar.

In the Marquam case the property was sold to satisfy both the first and second mortgages (of the mortgage company and of the title company, respectively). The title company had been made a party to the foreclosure suit by the first mortgagee, had set up its

own claims and had secured a foreclosure of its own lien as well as that of the first mortgagee. Its second mortgage had become merged in the judgment. Under such circumstances, the title company was compelled to bid at the foreclosure sale if it would protect its interest in the property. *Williams v. Wilson,* 42 Or. 299, 70 P. 1031, 95 Am. St. Rep. 745 (1902). In the case at bar, however, neither the defendant attorneys nor the Conger Corporation has set up the second mortgage in the foreclosure suit which was brought by the Pacific Savings and Loan Association. The Conger Corporation appeared upon the records as owner and not as second mortgagee. The foreclosure sale was only for the sums owing to the first mortgagee. To be sure, the rights of the Conger Corporation, as against the first mortgagee, were foreclosed, but the rights of Murray against the Conger Corporation were never adjudicated nor foreclosed in the suit brought by the Pacific Savings and Loan Association. In the Marquam case a second mortgagee successfully extinguished the mortgagor's interest by *purchasing* at a foreclosure sale pursuant to decree. In the case at bar the second mortgagee attempts to extinguish the mortgagor's interest by *selling* without any foreclosure decree. The distinction is obvious.

■ The only way in which defendant attorneys could acquire the record title to the property on the last day of the redemption period was by the exercise of the statutory right of redemption, which, in equity, belonged not to them but to the plaintiff, Murray. *Marquam v. Ross* is not in point, and we hold that the Watters group which received a conveyance from the Conger Corporation together with an assignment of the right of redemption were the assignees of the rights

which in equity belonged to the plaintiff, Murray, and upon exercising the statutory right of redemption the purchasing defendants must now be held to be mortgagees in possession, having the right to foreclose against the plaintiff, but being subject to his right to redeem upon payment of the sums found to be due them.

The foregoing must be our conclusion, unless the purchasing defendants were bona fide purchasers for value without notice of the equitable claims of the plaintiff. We now direct our attention to that question.

 The burden was upon the defendant purchasers to allege and prove that they were purchasers for valuable consideration, without notice of the equitable claim of the plaintiff.

"* * * In suits in equity, the claim of a bona fide purchaser for value is an affirmative defense, which must be pleaded, thereby placing the burden of proof in such cases upon the party relying thereon."

"* * * And the rule is that 'a want of that caution and diligence which an honest man of ordinary prudence is accustomed to exercise in making purchases, is, in judgment of law, a want of good faith.' Words and Phrases, Vol. 4, p. 3117.

"Whatever is sufficient to put a subsequent purchaser on inquiry must be considered legal notice to him of those rights, and when the purchaser omits to observe that ordinary precaution, he must be charged with a knowledge of all facts he might have learned by the exercise of reasonable diligence in making inquiry as to matters to which his attention has been directed." *Jennings v. Lentz,* 50 Or. 483, 93 P. 327, 29 L. R. A. (N. S.) 584 (1908). And see *Belt v. Matson,* 120 Or. 313, 252 P. 80 (1927).

In the recent case of *Moll v. Turnbow*, 155 Or. 229, 62 P. (2d) 941 (1936), the court said:

"In Weber v. Rothchild, 15 Or. 385, 390, (15 P. 650, 3 Am. St. Rep. 162), this court, with reference to the necessary pleading and proof on behalf of a defendant charged with participation in the fraudulent acts of a debtor, observed:

'It is the *bona fide* purchaser for value, in good faith and without notice, who is entitled to the protection of a court of equity as against the person sought to be defrauded by the conveyance. And this brings us to the examination of a very important question in this case, and that is this: Is the plaintiff required to prove a negative, by showing that the defendant did not pay a valuable consideration, or, having shown the fraudulent intent and purpose of the grantor, may he stop and require the grantee to prove that he paid value, in order to protect his title? Here the defendant Rothchild has alleged facts in one part of his answer tending to show that he is a *bona fide* purchaser for value without notice of this property, but he has offered no evidence whatever on those issues. The plea of a *bona fide* purchaser for value as here alleged is an affirmative defense interposed by the defendant, and in this connection it is not perceived that it differs from other affirmative defenses. The party having the affirmative of the issue must offer evidence to support it.'

"When the plaintiff had established the fact that Hazel Turnbow was not the real owner of the truck and trailer and that the pretended transfer of this equipment to her by her husband was with the purpose of hindering, delaying and defrauding his creditors, it then became necessary for McCormach to allege and prove that he was a *bona fide* purchaser for a valuable consideration and *without notice.*" *Moll v. Turnbow* (supra).

In citing the foregoing cases we do not necessarily mean that defendant attorneys were acting with consciously fraudulent intent, but we adopt the above rule concerning the burden of proof as being applicable to a sale by one having record title, subject to an outstanding equity. In such case the purchaser has the burden of proving himself to be a bona fide purchaser for value without notice of the equity.

■ There is no direct testimony to the effect that the purchasing defendants, on or before April 7, 1936, knew that the plaintiff then had an equity in the property or that the Conger Corporation was then without right to convey the title, but the absence of such testimony does not end our inquiry. We must determine if there was sufficient notice or knowledge in the purchasers to put them on inquiry concerning plaintiff's rights, and, if so, whether they exercised reasonable diligence in making such inquiry. If they were put on notice and did not make reasonable inquiry, then they are charged with knowledge of all facts that they might have learned had such diligence been exercised.

■ In the first place, we are of the opinion that notice to or knowledge by any of the purchasing defendants must be deemed notice to all. This is particularly true of any notice to the defendant, Watters, who acted as the spokesman for the entire group. The evidence clearly establishes the intimate relationship which existed between all of the purchasing defendants in this and previous transactions. Watters acted for all, and all were represented by the same attorney. See *Wood v. Rayburn*, 18 Or. 3, at 19, 22 P. 521.

The background of the picture is this: The purchasing defendants knew that the property had belonged to the plaintiff, Murray. It was known as the

Murray building. They certainly knew that Murray had conveyed the title to the Conger Corporation by a deed absolute in form, for the conveyance which they accepted was signed by the Conger Corporation. They certainly knew that a first mortgage had been foreclosed by the Pacific Savings and Loan Association, that the property had been bid in by that corporation, that the equity of redemption on the face of the record belonged to the Conger Corporation and that it would expire on March 23, 1936. The fact that they gathered in the sheriff's office to complete the transfer from the Conger Corporation to themselves and to redeem the property at 5:00 p. m. on that date can be explained on no other basis. And yet, knowing of all these facts concerning the apparent record rights of the Conger Corporation as the owner to redeem, they also had the knowledge, to which we now advert, of the rights, privileges or claims which were recognized by Wiley and D'Albini as still existing in the person of the plaintiff, Murray, who had no record interest whatsoever in the property. Such knowledge, we think, should have been a red flag to the purchasing defendants, warning them to investigate the nature of the rights which their vendors recognized as still existent in an apparent stranger to the then record title.

The plaintiff, Murray, testified that in February 1935, when the title was in the Conger Corporation, and shortly before the sale on foreclosure of the first mortgage, the following occurred (we quote):

"A. * * * I asked him (Watters) if he could get me a loan to redeem the property on Main Street, the Woolworth Building. * * *

"A. I asked him if he would give me a loan; and he says: 'What is the situation? How much of a loan do you want?' I told him it would take about

$65,000.00; I said that the Pacific Savings and Loan Association was foreclosing on the Building and that it was a surprise to me that they did because they had agreed not to do so if we would make an assignment of the rents."

We now summarize the various statements made to one or more of the purchasing defendants which tended to indicate that the plaintiff, Murray, still had an interest in the property, notwithstanding the fact that the record showed no such interest. From the testimony of the defendant, Wiley, we quote:

"Q. Did you tell Mr. Watters that you were going to give Mr. Murray the last chance to *retain this property*?

"A. Yes, * * * I thought it was the fair thing to do. * * * I simply told him that I would give Mr. Murray the first chance that I could to *save this property*." (Italics ours.)

Concerning his conversation with defendant, Watters, defendant, Wiley, testified:

"Q. At that time did you advise him that you would not sell, that Mr. Murray had the first chance on it?

"A. I said he had an offer for it.

"Q. Yes, go ahead.

"A. 1 said that Mr. McClure and also the Woolworth Company had been interested in acquiring the redemption and I said that McClure and the Woolworth Company had become interested and that Mr. Murray would have the preference over Mr. Watters and the group of business men. * * *""

At another point defendant, Wiley, testified that he informed Mr. Watters that Mr. Murray was to have the first opportunity "to get the property", and again he testified to informing Mr. Watters that the plaintiff,

Murray, had the "privilege of redeeming the property." Again he testified:

"Q. * * * Did you tell any of the other purchasers that you were going to give Mr. Murray the first chance to redeem this property before you sold it?
"A. I did."

Shortly thereafter, however, defendant, Wiley, testified that he was quite sure that he did not tell any of the other defendants except Mr. Watters concerning Murray's "privilege of redeeming the property." When defendant, Watters, first came to defendant Wiley, defendant, Wiley, testified:

"A. * * * I told him at that time that Mr. McClure of the Woolworth Company was also interested in this foreclosure sale, I told him Mr. McClure had already spoken to me and that I would not give an answer owing to the possibility that Mr. Murray might want to have the privilege of getting this redemption; I told him that both Mr. McClure and Mr. Murray both came ahead of him."

Again, defendant, Wiley, testified:

"A. * * * I told him (Mr. Watters) that Mr. Murray had the first right to acquire the equity of redemption * * *."

On another occasion he testified that he said Mr. Murray would have, "as a matter of courtesy, the first right to acquire that equity of redemption from the Conger Corporation."

The evidence discloses that negotiations for the assignment of the equity of redemption to the purchasing defendants commenced about thirty days before the deadline on March 23, 1936, when the right of redemption would have expired. About twenty-two days before

the deadline, the plaintiff, Murray, wrote to the defendant, Wiley, in part as follows:

"However, it may not be amiss for me to say that this property belongs to Mrs. Murray and me and we are the sole arbiters of its disposition. Nothing has ever been said or done that can, or should, be construed to change this status. When we sell our equity we shall receive what we deem it is worth, otherwise it will not be disposed of."

Concerning this letter, Wiley testified as follows:

"Q. * * * Did you ever tell Mr. Watters that you had received a letter from Mr. Murray in which Mr. Murray claimed that he was the absolute owner of that property and positively informed you not to sell it without his authority?

"A. I don't think I told him about it, no.

"Q. You didn't tell Judge Kuykendall?

"A. I don't think so.

"Q. As an attorney experienced in matters of that kind, didn't you think that might be interesting for them to know whether there was a first claim to that title outstanding?

"A. No. I was satisfied with the thing, I didn't regard it that way.

"Q. You didn't feel that you were under any duty to tell them about it?

"A. I didn't think it was necessary to discuss every little detail about somebody claiming the property, no."

It seems to us that good faith on the part of the defendant, Wiley, would have required that he advise Judge Kuykendall, who was the attorney for the purchasing defendants, concerning so explicit a claim as that made by the plaintiff, Murray, in his letter of March 1, 1936, which claim must have been the assertion of an equitable interest in the property, the legal title having been in the Conger Corporation. It is difficult

for us to believe that an attorney of the high standing of the defendant, Wiley, (attested by the opinion of the circuit judge) would have failed to disclose so vital a matter to Judge Kuykendall, and the apparent hesitancy of his denials set forth above suggests that some notice of the plaintiff, Murray's, claim may have been communicated to Judge Kuykendall. It is to be noted that Judge Kuykendall did not testify. If there was no such disclosure to any of the purchasing defendants or their attorney, it is obvious that the defendant attorneys were deliberately selling a law suit along with the property, a conclusion which we should be reluctant to adopt.

Defendant, Watters, was a real estate man of wide experience, owning a number of properties in the vicinity, and who made it his business to familiarize himself with real estate transactions. He had known the plaintiff, Murray, for a long time and knew of plaintiff's former ownership of the Murray building. He knew who the officers of the Conger Corporation were. He testified that defendant, Wiley, had informed him that there were two other parties who were interested, "That they came before me." He further testified, speaking of Wiley:

"A. * * * I just knew that he had given Mr. Murray the first right to purchase the equity of redemption."

Watters testified further as follows:

"Q. Did you ask him (Wiley) whether or not Mr. Murray claimed any interest in the building?

"A. No. * * *

"Q. Did he volunteer any information concerning it?

"A. No. His interest is that he wants to sell it on the right of redemption and on the *indebtedness that was outstanding.* * * *" (Italics ours.)

Again, defendant, Watters, testified that he told Judge Kuykendall that

"Mr. Murray was first, of course, and that other party was second choice on the purchase of the right of redemption."

Defendant Watters expressly admitted that he had been informed that Mr. Murray had the first right to purchase the redemption, although his testimony is somewhat inconsistent, for, upon being asked:

"Q. As a matter of fact, weren't you all holding back to see if Mr. Murray was going to come and redeem that property?"

he answered, "No."

Turning to the testimony of the defendant, Martin, we find that he testified as follows:

"Q. Did you know who had the right to redeem?
"A. No.
"Q. Did you know or hear that Mr. Murray was in the property?
"A. Yes.
"Q. Who did you hear that from?
"A. I do not recall. I always knew it was the Murray Building and naturally I supposed he had the right.
"Q. Had the right to redeem?
"A. Yes sir."

Defendant, West, testified that Mr. Watters never told him about Mr. Murray having the precedence in connection with the redeeming, but he later testified:

"Q. Your understanding at Judge Kuykendall's office was that the contract was still dependent upon whether or not the money could be had from Mr. Murray prior to the time the sheriff's office closed?
"A. Right.

"Q. There was still that contingency in the event that Mr. Murray would show up?

"A. Right, that was my understanding; that if Mr. Murray showed up and took up the equity of redemption prior to 5:00 o'clock, that was decisive."

■ The record clearly establishes from the testimony of the defendants themselves that they were possessed of information sufficient to put them upon reasonable inquiry concerning the rights of Murray in the property the record title to which was in the Conger Corporation. Most, if not all, of the negotiations concerning the purchase of the property by the Watters group took place in March 1936, and subsequent to the violent disagreement between Murray and Wiley, as manifested in Murray's letter to Wiley of March 1, 1936. If the defendant purchasers, or any of them, had made the slightest inquiry of the plaintiff, Murray, or, we presume, of the defendant Wiley, the facts of the controversy could have been obtained, upon which facts the purchasing defendants would have formed their own conclusions as to the law at their own peril. Yet, the defendants, Watters, West and Martin, testified with almost enthusiastic emphasis that they made no investigation whatsoever. The defendant, Moore, did not testify. Our conclusion is that they are not bona fide purchasers for value without notice, but are, on the contrary, mortgagees in possession of the property in controversy and that the plaintiff is the beneficial owner of the property subject to the liens of the various defendants. *Wood v. Rayburn* (supra); *Grover v. Hawthorne,* 62 Or. 77, at 97, 121 P. 808 (1912); *Belt v. Matson* (supra); *Eisaman v. Gallagher,* 24 Neb. 79, 37 N. W. 941 (Neb., 1888); *Niehaus v. Shetter* (supra).

The cause must be remanded to the circuit court for an accounting appropriate to that situation.

The defendant purchasers in redeeming the property were required to and did pay out $63,711.60. By so doing, they are entitled to credit in that amount plus interest at six per cent per annum from the date of payment.

There was, at the time of the conveyance to the purchasing defendants, a lien for about $3,200 against the property for personal income taxes assessed against the plaintiffs. In November 1936, Deputy Collector Owlsley discussed the matter with defendant, Watters. Owlsley testified as follows:

> "He (Watters) told me we could sell the property, and he would appeal the sale and buy it back; his statement was that such a purchase would better perfect the title."

Watters' statement, as repeated by Owlsley, fortifies our earlier conclusion that the purchasing defendants had notice of plaintiff's outstanding equity, otherwise why would they let the property go to sale on the income tax lien in order to perfect the title? Surely, a proper tender of the amount of the tax at a proper time could have been made and would have been accepted by the collector.

In April 1937, the Collector of Internal Revenue proceeded to sell the property to realize the tax. The defendant purchasers made a tender which, for unexplained reasons, was rejected. The property was sold by the collector and was bid in by the purchasing defendants for $16,500. We cannot in this suit adjudicate the rights of the parties against the collector, as he is not now a party to this case, having successfully challenged the jurisdiction of the court, but the defendants assert that the "amount of $16,500 is now held by the Collector of Internal Revenue with the understanding

that it will be accounted for on the determination of this suit." In the opinion of the circuit court it appears that counsel for Collector Maloney informed the court that "In disposing of the moneys which he holds in the premises, he (Maloney) will govern himself in accordance with the terms of the decree in this case." The amount of tax which stood as a lien against the property immediately prior to the sale by the collector must, in the accounting, stand as a further credit to the purchasing defendants. Having freed the property from the tax lien, they are entitled to add that amount, with interest at six per cent, to their claims against the property. They are, of course, entitled to receive from the collector the balance of funds now in his hands over and above the amount which he may be entitled to retain.

Nor can the plaintiff redeem without paying to the defendants, Wiley and D'Albini, reasonable fees for their legal services performed prior to and owing on August 20, 1932. The property which was conveyed to the purchasing defendants was security for all attorneys' fees owing the defendant attorneys at that time. The parties are all before us, and the entire matter should be determined in this suit upon remand to the circuit court. The property described in the complaint is subject to a lien in favor of the purchasing defendants in an amount which on accounting shall be ascertained and fixed as due them out of the property. It also stands as security for the fees which were owing to the defendant attorneys on August 20, 1932, with interest at six per cent per annum, less any payments which have been made thereon. At least a partial payment has in effect been made upon those fees. The purchasing defendants paid about $65,000 for the property, of which $63,711.60 was paid to redeem the

property from the first mortgage. The balance was paid in cash direct to Wiley and D'Albini, and it appears that some other small sums were realized by the defendant attorneys in connection with the transfer. (This cash portion of the purported purchase price, approximately $1,300, never went through the books of the Conger Corporation.) The sum of approximately $1,300 (the exact sum to be fixed on the accounting) constitutes a payment pro tanto to the defendant attorneys on their claim against the plaintiff, Murray. The amount in which the plaintiff was indebted to the defendant attorneys as of August 20, 1932, should be determined. We are of the opinion that the promissory notes which the plaintiff delivered to the defendant attorneys constitute evidence, but not conclusive evidence, of the amount of their fees. In the accounting between the plaintiff, Murray, and the purchasing defendants, the latter would be entitled to an additional credit to the extent of the amount paid by them to the defendant attorneys and which reduced pro tanto Murray's indebtedness for attorneys' fees. On the other hand, in the accounting between the plaintiff, Murray, and the defendant attorneys, Murray will be entitled to a credit against his indebtedness for attorneys' fees in the amount in which those fees were reduced by cash payments (approximately $1,300) made by the defendant purchasers to Wiley and D'Albini. Defendants, Wiley and D'Albini, are entitled to a lien subsequent to that of the purchasing defendants, for any excess of the attorneys' fees remaining unpaid after crediting the sum paid thereon by the purchasing defendants.

Upon full accounting being had, covering the matters indicated and all dealings by the defendant purchasers as mortgagees in possession, a decree should

be entered fixing the amount, if any, in which the property described in the complaint is subject to a lien in favor of the purchasing defendants, and also fixing the amount, if any, in which the property is subject to a subsequent lien in favor of the defendant attorneys for the balance, if any, of the attorneys' fees. Defendant attorneys are entitled to judgment for such balance, if any. The decree should provide that upon payment to the purchasing defendants and to the defendant attorneys of the amounts of their respective liens, the defendants, and all of them, be directed to reconvey the property to the plaintiff, and that in default of such reconveyance the decree stand in lieu thereof. The decree should also provide that if the respective sums are not paid, the plaintiff be foreclosed by a sale, subject to redemption as in other mortgage foreclosures, the proceeds to be applied first to the usual costs, etc., thereafter to the extinguishment of the lien of the purchasing defendants and thereafter to the extinguishment of the judgment and lien, if any, of the defendants, Wiley and D'Albini.

The plaintiff will recover his costs.

————

Petition for rehearing denied September 29, 1942

On Petition for Rehearing
(129 P. (2d) 66)

BRAND, J. The purchasing defendants (Watters et al.) have filed a petition for rehearing. The defendant attorneys have not joined therein. The petitioners set forth eight specifications of alleged error, the first seven of which concern the merits of the controversy.

■ We have carefully considered the briefs of both parties on the petition and have considered the evi-

dence and find no reason for modification of our previous opinion.

The eighth specification of the petition is as follows:

"The decree is inequitable and unjust in that it does not provide for costs of management and repairs of building by the mortgagee in possession and that it does not provide for a strict foreclosure."

Concerning the allegation that we have not provided for costs of management and repairs of the building by the mortgagee in possession, it must be noted that our original opinion provided that

"Upon full accounting being had, covering the matters indicated and all dealings by the defendant purchasers as mortgagees in possession, a decree should be entered fixing the amount, if any, in which the property described in the complaint is subject to a lien in favor of the purchasing defendants * * *."

Upon the record in this court, it is impossible to determine the amount of any expenditures for management and repairs or the character of such expenditures for management and repairs, if any. Upon such amended pleadings as the trial court may find proper to permit, an accounting will be had, and the purchasing defendants will be entitled to credit for such expenditures as may have been properly made by them as mortgagees in possession, bearing in mind the fact that they are not bona fide purchasers for value without notice.

In our former opinion we said:

"The decree should provide that upon payment to the purchasing defendants and to the defendant attorneys of the amounts of their respective liens, the defendants, and all of them, be directed to reconvey the property to the plaintiff, and that

> in default of such reconveyance the decree stand in lieu thereof."

We adhere to that opinion. We also said:

> "The decree should also provide that if the respective sums are not paid, the plaintiff be foreclosed by a sale, subject to redemption as in other mortgage foreclosures * * *."

The question as to the form of the decree and as to the rights of the parties in the event that the plaintiff should fail to redeem, was not argued in the original briefs. We were under the impression that in the event of plaintiff's failure to redeem after accounting, a sale on foreclosure, subject to redemption, would be necessary in order to extinguish the plaintiff's interest in the property, in accordance with O. C. L. A. 9-501, which provides in substance that liens on real property shall be foreclosed and the property advertised to be sold to satisfy the debt secured thereby. Upon further consideration, however, we have concluded that the statute is not controlling under the facts of this case. It is obvious that by reason of the redemption from the sale on the first mortgage by the purchasing defendants, the plaintiff has, as to that sale, already enjoyed more than a year after the foreclosure sale within which he will be entitled to redeem. There is no reason in equity and good conscience for allowing him another year for redemption after another sale on foreclosure. Furthermore, this is not a suit instituted by the mortgagees to foreclose a mortgage. It is a suit by the mortgagor to redeem. The requirement that in suits brought for the foreclosure of a mortgage the property shall be sold subject to the right of redemption by the mortgagor is obviously for the benefit of the mortgagor. In the case

at bar, the plaintiff seeking to redeem does not ask that the property be sold subject to redemption, but, on the contrary, plaintiff prays for a decree

> "Requiring each and all of the defendants herein (other than J. W. Maloney) to account to plaintiffs for all sums received by them from said property, its income, rents or profits, and to prove in this court all sums paid out by them for the protection and preservation of said trust properties and determining the amounts due from said trustees and the amounts to be allowed to them in the execution of said trust, including whatever sums may be due said defendants from said defendant J. W. Maloney for and on account of the said surplus resulting from said income tax foreclosure sale; and if the balance of said accounts shall be in favor of plaintiffs, decreeing that said balance be paid to them forthwith, but if the balance of said account shall be in favor of defendants, then directing that said balance be paid defendants as a condition precedent to the reconveyance of the property by defendants to plaintiffs upon such conditions as to the court may seem just and equitable."

The authorities, which have not been called to our attention by either party, disclose an exception to the rule requiring a sale on foreclosure subject to redemption. We find the exception applicable to the case at bar. The rule is stated by an eminent authority as follows:

> "As affecting the right of redemption, it frequently becomes necessary to determine the character of the instrument under which redemption is sought. This happens where the conveyance is by a deed absolute on its face but which the grantor claims was executed to secure the payment of a debt or the performance of a condition. Under such circumstances, where the grantee refuses to reconvey on payment or tender of payment of the debt

on performance of the condition, insisting that the transaction was an absolute conveyance, the grantor may institute a suit to determine the character of the instrument. This may be done by a bill in equity or by an action under the statute in the nature of a bill in equity. The action being equitable in its nature, the grantor is entitled to complete relief and the petition usually asks for an accounting accompanied with a prayer that the petitioner be allowed to redeem. Where it clearly appears that the deed was intended as a security the action will lie. The action may be instituted for the sole purpose of having the deed declared to be a mortgage, but the grantor must also offer to redeem the property and place himself within the jurisdiction of the court to settle the whole controversy. Reconveyance will be decreed upon payment of the debt in full.'' Jones on Mortgages, Vol. II, 8th ed., p. 881, No. 1398.

Again, it is said:

"The form of the judgment ordinarily is, that the plaintiff may redeem upon paying the amount found due on the mortgage within a specified time, together with costs; and that upon his doing so the defendant shall discharge the mortgage and deliver up the mortgaged premises; and that upon default of such payment the complaint be dismissed with costs. The determination of the form together with the terms and conditions rests largely in the sound discretion of the court under the facts of each case. A decree which provides that on failure to make payment within the time named the mortgage shall stand foreclosed, is not erroneous in that it does not direct a sale on failure to redeem, and the proceedings are in a state in which a strict foreclosure is not allowed. A decree in this form is in legal effect the same as a decree that upon default the bill shall be dismissed with costs, for upon dismissal the mortgage is foreclosed without

any formal decree." Jones on Mortgages, Vol. II, 8th ed., p. 901, No. 1412.

In the case of *Martin v. Ratcliff*, 101 Mo. 254, 13 S. W. 1051, 20 Am. St. Rep. 605 (1890), the plaintiffs as heirs of the mortgagor brought suit to redeem real property from a sale which had been had under a power contained in the mortgage. It was held that the plaintiffs were entitled to redeem. The court said:

"Our statute concerning mortgages and deeds of trust contemplates a sale of the premises in all suits brought to foreclose such instruments, and a strict foreclosure in any such case would be erroneous on its face. There is no doubt but the court may, on a petition to redeem, direct a sale of the premises in the event the redemption money is not paid within the specified time. And in such cases the sale may be ordered, though there is no specific prayer therefor, either in the petition or answer. But it is a different thing to say that a decree is, on its face, erroneous, and must be reversed, because it does not provide for a sale. The plaintiffs in this case did not ask for a sale of the property in their petition. They did not, by motion or otherwise, ask the court to modify the decree. They have made no showing that a sale can be of any possible benefit to them. If this decree is reversed, it must be upon the ground that in all suits, where there is a decree permitting the plaintiff to redeem, there must be a further order that, in case of default in payment of the amount found due, the premises shall be sold. This, in our judgment, is not the law, for there is a wide distinction between a suit of foreclosure and one brought to redeem from a voidable foreclosure sale."

To the same effect, see *Machold v. Farnan*, 20 Idaho 80, 117, P. 408 (1911); *Decker v. Patton*, 120 Ill. 464,

11 N. E. 897 (1887); and *Blanchard v. Hoffman*, 154 Minn. 525, 192 N. W. 352 (1923). As said by an Illinois court:

> "[One seeking to redeem] must be regarded in equity as bringing the amount which should be so found due into court, and tendering the same when so ascertained." *Magnusson v. Charlson*, 32 Ill. App. 580 at 587 and 588.

This being a suit by the mortgagor to redeem, provisions concerning sale on foreclosure being for the benefit of the mortgagor and plaintiff having prayed only for relief in the nature of strict foreclosure, we are of the opinion that we are authorized to and in equity we should modify the last sentence of our former opinion. We apprehend that the plaintiff will not redeem from the purchasing defendants unless he is also able to and does redeem from the defendant attorneys, so the decree of the circuit court should determine upon and specify a reasonable time within which plaintiff may redeem from both liens or be forever barred.

The petition is denied.