VERMEER et al,
*Appellants,*

*v.*

DISMANTLING CONTRACTORS, INC., et al,
*Defendants,*

WESTERN DISMANTLING CORP,
*Respondent.*

(A8406-03431; CA A40696)

751 P2d 796

Jill Backes, Portland, argued the cause for appellants. With her on the briefs were Alan M. Scott and Galton, Popick & Scott, Portland.

Roger J. Leo, Portland, argued the cause and filed the brief for respondent.

Before Warden, Presiding Judge, and Joseph, Chief Judge,* and Van Hoomissen, Judge.

WARDEN, P. J.

---

* Joseph, C. J., *vice* Young, J., deceased.

### WARDEN, P. J.

Plaintiffs are the trustees of several employer/employe trusts established by collective bargaining agreements between union contractors and the Laborers' Union (the union) to provide health, pension and vacation benefits to union laborers in Oregon. They seek an accounting of contributions which, they assert, defendant Western Dismantling Corp. (Western) was required to pay on behalf of laborers which it employed. Western did not have an agreement with the union; plaintiffs allege, instead, that it is the alter ego of Dismantling Contractors, Inc. (Dismantling), which did, and that Western is therefore bound by Dismantling's agreement. The trial court found for Western. On *de novo* review, ORS 19.125(3), we reverse.[1]

John R. Staatz (John) has been in the construction business for many years, doing business as John Staatz Construction Co., a sole proprietorship. Much of his work involved the demolition of buildings. He had an agreement with the union for a short period in the late 1960's, but from 1970 to 1980 he operated as a non-union contractor. In 1980, while he was working on a project for Publisher's Paper Co. in Oregon City, the union and Publisher's jointly required that he sign a pre-hire agreement with the union in order to continue on the job. That agreement would bind him to the union's collective bargaining agreement. John thereupon formed Dismantling, which executed the agreement on September 12, 1980. John signed as president of Dismantling, and his wife, Clarine Staatz, signed as secretary. However, the corporation did not hold its organizational meeting until August, 1981. John's daughters then became the only stockholders. Judy Staatz (Judy) was alloted 51 shares and Connie Staatz (Connie) 49, although neither actually received the certificates. Judy was named president and John secretary/treasurer.

After finishing the Publisher's Paper job, Dismantling took on one or two other jobs, also as union projects. In

---

[1] The trial court also found that Dismantling owed contributions in addition to those that it had paid and ordered an accounting. It entered a judgment pursuant to ORCP 67B as to the other defendants. Dismantling was never a party to this appeal; we previously dismissed the appeal as to defendants John Staatz, dba John Staatz Construction Co., Judy May Staatz and Connie R. Staatz, because plaintiffs' opening brief asserted no error as to them. Western is the only remaining respondent. Neither party challenges the scope of our review.

the fall of 1982, it had a subcontract from a union contractor for a project at Holladay Park Hospital. Part way through the project, the hospital, in order to cut its costs, decided to become its own general contractor and to insist on non-union workers. John, in both his own name and that of Dismantling, bid on the remaining portions of the job on a non-union basis and received the contract. Rather than have Dismantling perform the work, John incorporated Western to do it. The stock of the new corporation was also issued to his daughters in a 51/49 split, and Judy became president. John, however, managed the Holladay Park project, with some assistance from Judy.

No one actually paid for the stock in Western or in Dismantling. Western was funded by a "mobilization fee," or advance, from the hospital. Like Dismantling, it has never owned significant assets but has leased equipment as needed. Although the record is not complete, it appears that Western used most of the same workers for its part of the Holladay Park project that Dismantling had earlier used for its part. Dismantling and Western also had the same liability insurance policy, used the same post office boxes and shared the same office.

Western had a number of jobs after Holladay Park, all of them non-union. It remained active on a regular basis. Many of its jobs were relatively small, and most involved interior dismantling, but it also had projects which included the demolition of large structures. Dismantling had little work and was twice involuntarily dissolved by the Corporation Commissioner. It seems to have been reactivated only when there was a union job available. Because of his experience and financial position, John remained active with both corporations.

In attempting to distinguish Western from Dismantling, Western emphasizes Judy's increasing involvement in it and what it sees as her limited involvement in Dismantling. Although she was president of Dismantling, and later became president of Western, Judy's participation in both corporations was limited before 1983. She had been an apprentice plumber and was interested in a career in the construction industry. In 1983 and after, she spent much of her time on Western's business, gradually moving into a managerial role,

although her pay stayed at $5 or $6 per hour. She did not, however, ignore Dismantling, of which she remained president. Dismantling's tax return for 1983 listed her as giving 100 percent of her time to that corporation. Although that statement was inaccurate, it is clear that Judy did give Dismantling's business a portion of her time.[2]

The evidence most clearly suggests that Dismantling and Western functioned as different sides of the same business; John was the dominant figure in both. Western's reliance on Judy's supposedly greater involvement in its business and on its supposed emphasis on smaller projects is not convincing. It appears, rather, that John started each corporation because he had to do so—Dismantling in order to sign with the union, Western in order to avoid the union—and that he placed his daughters in nominal control of each, possibly because of his pending divorce, possibly to keep the businesses in the family. Connie was not interested in the business, but Judy was, and John therefore involved her in it. She did not begin to work in the business until the Holladay Park project or later, so she naturally focused on Western, which by then was the more active company. In October, 1985, Dismantling attempted to repudiate its agreement with the union, and John thereafter made his son, John E. Staatz, its president, although neither John nor his son has any stock in it. After that time it may be appropriate to treat the corporations as separate aspects of John's legacy to his children, but before that they were, for all practical purposes, the same.[3]

We must decide whether Western was an alter ego of Dismantling, as plaintiffs claim, on the basis of these facts and in accordance with federal labor law. *Packinghouse Workers v. Needham,* 376 US 247, 250, 84 S Ct 773, 11 L Ed 2d 680 (1964). Federal appellate courts have discussed the alter ego doctrine in the context of "double breasted" companies in a

---

[2] In its brief, Western explains that Judy's involvement with Dismantling was a result of a bitter divorce between John and Clarine. The record is unclear on the details of the divorce and on the time period involved. We cannot escape the impression that, although the divorce had some impact on John's business and on Judy's involvement with it, Western uses it as a convenient explanation of much inconvenient evidence. We cannot accept the divorce as an adequate explanation of *all* of Judy's involvement with Dismantling, as defendant would have us do.

[3] The trial court held that Dismantling effectively repudiated the pre-hire agreement in October, 1985; that ruling is not involved in this appeal.

number of cases.[4] Such operations are not necessarily improper; their use simply to avoid an employer's contractual obligations to a union is what the federal alter ego doctrine is designed to prevent. The cases arise most often in situations where one business ceases to operate and another takes over. The focus of the doctrine "is on the existence of a disguised continuance or an attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or technical change in operations." *Carpenters Local U. No. 1846 v. Pratt-Farnsworth,* 690 F2d 489, 508 (5th Cir 1982), *cert den* 464 US 932 (1983). That doctrine does not require that the first business have entirely ceased operations, but rather that the focus of activity have shifted to the new entity. *See Crest Tankers v. National Maritime Union of America,* 796 F2d 234 (8th Cir 1986).[5] The factors for consideration are:

> "(1) Centralized control of labor relations, (2) common management, (3) interrelation of operations, and (4) common ownership and financial control." *J.M. Tanaka Const., Inc. v. N.L.R.B.,* 675 F2d 1029, 1033 (9th Cir 1982).[6]

Not every factor need be present; the most important one is centralized control of labor relations.

Under those criteria, Western was the alter ego of Dismantling. It came into existence in order to take over a project which Dismantling began; its only reason for existence was to avoid Dismantling's obligations to the union. It had the same management, including the same control of labor relations, as did Dismantling. It took over the majority of Dismantling's work force, and the two companies continued to share workers thereafter, including office staff. They used the same phone numbers, post office boxes and insurance policies.

---

[4] The cases often rely also on the "single employer" doctrine. To the extent that that doctrine is distinguishable from that of alter ego, plaintiffs have withdrawn any claim based on it.

[5] Because the question is one of national labor policy, the precise context of a particular decision is not especially important. The basic question in all cases is whether a business is bound by a collective bargaining agreement which a different business executed. That issue is the same whether the case involves a decision of the NLRB in an unfair labor practice proceeding or a judicial proceeding by the union or others to enforce the agreement. *See, e.g., N.L.R.B. v. Al Bryant, Inc.,* 711 F2d 543 (3rd Cir 1983), *cert den* 464 US 1039 (1984).

[6] These criteria are not necessarily identical to those which we would apply to an alter ego claim under state law. *See, e.g., Murray v. Wiley,* 169 Or 381, 399-400, 127 P2d 112, 129 P2d 66 (1942).

Judy's involvement in Western was a natural development of her interest in the business, not a differentiating characteristic. Although Dismantling continued to exist after the formation of Western, it was active only sporadically; Western became the primary company. In short, Western was in substance the continuation of Dismantling under a different name.[7] The trial court erred in finding otherwise, and we therefore reverse its decision.

Reversed and remanded.

---

[7] Western's non-union status is not a sufficient basis to distinguish it from Dismantling. If it were, there could never be a successful alter ego claim, and disgruntled employers could avoid agreements and ignore employes' collectively bargained rights with impunity.